T.C. Memo. 2007-25

UNITED STATES TAX COURT

ROGER AND LORA CARTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20719-04L.              Filed February 6, 2007.

<u>Terri A. Merriam</u>, for petitioners.

<u>Gregory M. Hahn</u> and <u>Thomas N. Tomashek</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Petitioners filed a petition with this Court
in response to a Notice of Determination Concerning Collection
Action(s) Under Section 6320 and/or 6330 (notice of
determination) for 1981 through 1988.[1]  Pursuant to section

--------

[1]  Unless otherwise indicated, all section references are to
                                                (continued...)

6330(d), petitioners seek review of respondent's determination. The issue for decision is whether respondent abused his discretion in sustaining the proposed collection action.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, fourth, and fifth stipulations of fact and the attached exhibits are incorporated herein by this reference.[3]

---

[1](...continued) the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

[2] Petitioners also dispute respondent's determination that they are liable for the increased rate of interest on tax-motivated transactions under sec. 6621(c). As to this dispute, the parties filed a stipulation to be bound by the Court's determination in Ertz v. Commissioner, T.C. Memo. 2007-15, which involves a similar issue.

[3] Respondent reserved relevancy objections to many of the exhibits attached to the stipulations of fact. Fed. R. Evid. 402 provides the general rule that all relevant evidence is admissible, while evidence which is not relevant is not admissible. Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While the relevance of some exhibits is certainly limited, we find that the exhibits meet the threshold definition of relevant evidence and are admissible. The Court will give the exhibits only such consideration as is warranted by their pertinence to the Court's analysis of petitioners' case.

Respondent also objected to many of the exhibits on the basis of hearsay. Even if we were to receive those exhibits into evidence, they would have no impact on our findings of fact or on the outcome of this case.

Petitioners resided in Corbett, Oregon, when they filed their petition. Petitioners have been married for 33 years, have two adult children, and one grandchild. At the time of trial, petitioner Roger Carter (Mr. Carter) was 55 years old and petitioner Lora Carter (Mrs. Carter) was 53. Mr. Carter has a high school education and is currently employed as a supervising electrician. Mrs. Carter has a degree as a dental assistant, but has worked only sporadically since 1974. At the time of petitioners' section 6330 hearing, Mrs. Carter worked at Lowe's, a home improvement store.

In 1984, petitioners became partners in Shorthorn Genetic Engineering, Ltd. 1984-4 (SGE 84-4), a cattle breeding partnership organized and operated by Walter J. Hoyt III (Hoyt).[4]

From about 1971 through 1998, Hoyt organized, promoted, and operated more than 100 cattle breeding partnerships. Hoyt also organized, promoted, and operated sheep breeding partnerships. From 1983 to his subsequent removal by the Tax Court in 2000 through 2003, Hoyt was the tax matters partner of each Hoyt partnership. From approximately 1980 through 1997, Hoyt was a licensed enrolled agent, and as such, he represented many of the

---

[4] Petitioners were also partners in other Hoyt-related partnerships identified as DSBS 1990-5, HS Truck, TBS 1989-3, and TBS. The details of these partnerships are not in the record. Though unclear, it appears that all adjustments made to petitioners' income tax liability for the years in issue arose from their involvement in SGE 84-4 only.

Hoyt partners before the Internal Revenue Service (IRS).  In 1998, Hoyt's enrolled agent status was revoked.  Hoyt was convicted of various criminal charges in 2000.[5]

Beginning in 1984 until at least 1988, petitioners claimed losses and credits on their Federal income tax returns arising from their involvement in the Hoyt partnerships.  Petitioners also carried back unused investment credits to 1981, 1982, and 1983.  As a result of these losses and credits, petitioners reported overpayments of tax for 1981 through 1988 and received refunds in the amounts claimed.

---

[5]  Petitioners ask the Court to take judicial notice of certain "facts" in other Hoyt-related cases and apply judicial estoppel to "facts respondent has asserted in previous [Hoyt-related] litigation".  We do neither.

A judicially noticeable fact is one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Petitioners are not asking the Court to take judicial notice of facts that are not subject to reasonable dispute.  Instead, petitioners are asking the Court to take judicial notice of the truth of assertions made by taxpayers and the Commissioner in other Hoyt-related cases.  Such assertions are not the proper subject of judicial notice.

The doctrine of judicial estoppel prevents a party from asserting in a legal proceeding a claim that is inconsistent with a position successfully taken by that party in a previous proceeding.  New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  Among the requirements for judicial estoppel to be invoked, a party's current litigating position must be "clearly inconsistent" with a prior litigating position.  Id. at 750-751.  Petitioners have failed to identify any clear inconsistencies between respondent's current position and his position in any previous litigation.

Respondent issued Notices of final partnership administrative adjustments (FPAAs) to SGE 84-4 for its 1984 through 1986 taxable years.[6]  After completion of the partnership-level proceedings, respondent sent petitioners a Form 4549A-CG, Income Tax Examination Changes, reflecting changes made for petitioners' 1981 through 1988 tax years on July 30, 1998. Respondent determined deficiencies in petitioners' income tax of $8,098, $3,405, $941, $8,421, $14,034, $7,714, $3,239, and $413, respectively.

On August 17, 2001, respondent issued petitioners a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (final notice).  The final notice included petitioners' outstanding tax liabilities for 1981 through 1988.

On September 14, 2001, petitioners submitted a Form 12153, Request for a Collection Due Process Hearing.  Petitioners argued that the proposed levies were inappropriate and that an offer-in-compromise should be accepted.

On May 9, 2002, petitioners submitted a letter (the May 2002 letter) to respondent's Appeals Office outlining their position with respect to the proposed collection action.  Petitioners alleged that they were victims of Hoyt's fraud and asserted

---

[6]  SGE 84-4 was also issued an FPAA for 1987.  However, it does not appear that the adjustments made to petitioners' income tax liability for the 1981-88 tax years arose from partnership level proceedings relating to the 1987 FPAA.

various arguments regarding the appropriateness of an offer-in-compromise.

On October 31, 2003, petitioners' case was assigned to Settlement Officer Linda Cochran (Ms. Cochran).

On February 13, 2004, petitioners submitted a letter (the February 2004 letter) to Ms. Cochran. Petitioners described their involvement in the Hoyt partnerships and made various assertions regarding equity and public policy considerations. Petitioners attached several exhibits to the February 2004 letter.

On March 8, 2004, Ms. Cochran sent petitioners a letter scheduling a telephone section 6330 hearing for March 31, 2004. Petitioners' representative, Terri A. Merriam (Ms. Merriam), requested that the hearing be delayed due to the number of Hoyt-related cases her law firm was handling. Ms. Cochran did not change the date of the hearing, but extended petitioners' deadline for producing information to be considered to May 14, 2004.

On May 14, 2004, petitioners submitted to Ms. Cochran a Form 656, Offer in Compromise, a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and three letters (the May 14, 2004 letters) explaining the offer amount and other payment considerations and setting out in detail petitioners' position regarding the offer-in-compromise.

Petitioners attached several exhibits to the May 14, 2004 letters.

The Form 656 indicated that petitioners were seeking an offer-in-compromise based on either doubt as to collectibility with special circumstances or effective tax administration. Petitioners offered to pay $99,851 to compromise their outstanding tax liabilities for 1981 through 1996.[7]  At the time of the section 6330 hearing, $187,041 had been assessed against petitioners with respect to their 1981 through 1996 tax years.

On the Form 433-A, petitioners listed the following assets:

| Asset | Current Balance/Value | Loan Balance |
| --- | --- | --- |
| Checking account | $5,226 | n/a |
| Savings accounts | 322 | n/a |
| Mutual fund | 12,167 | -0- |
| Cash value of life insurance policy | 1,191 | -0- |
| 1997 Ford Expedition | 7,650 | -0- |
| 1978 Ford F-250 | De minimis | -0- |
| 1964 Ford Falcon | De minimis | -0- |
| House | 220,200 | $82,009 |
| Personal effects | 4,000 | -0- |
| Total | 250,756 | 82,009 |

---

[7]  The details of petitioners' 1989-1996 taxable years are not in the record.

The reported value of the house reflected an 80-percent "quick-sale" value.  Petitioners also reported that Mr. Carter had a pension fund valued at $123,591, but indicated that it was not currently accessible.

Petitioners reported gross monthly income of $4,458, representing Mr. Carter's wages of $3,496, Ms. Carter's wages of $827, and other income of $135.[8]  Petitioners also reported the following monthly living expenses:

| Expense item | Monthly Expense |
|---|---|
| Housing | $1,648 |
| Transportation | 390 |
| Health care | 212 |
| Taxes | 1,210 |
| Life insurance | 56 |
| Attorney's fees | 299 |
| Other business-related expenses | 176 |
| Total | 3,991 |

In one of the May 14, 2004 letters, petitioners state that they are offering to pay $99,851 "for all Hoyt related years to be paid in one lump sum payment.  The amount accounts for all the

---

[8]  The Form 433-A in evidence does not include page 6, which would include "Section 9, Monthly Income and Expense Analysis" and the signature line.  Thus, our findings of fact regarding petitioners' monthly income and expenses come from representations made by respondent in the Notice of Determination.

tax liability for 1981 through 1998, and regular interest through April 15, 1993." The letter included a description of petitioners' medical conditions. Mr. Carter was diagnosed with a degenerative back problem in 1969 and has problems with both knees and one hip.[9] Mrs. Carter has a congenital birth defect that affects kidney and bladder function, and she also suffers from collagenous colitis, sarcoidosis, Wegner's disease, and atrial fibrillation. The letter also included a "retirement analysis", outlining the need for home repairs and the likelihood of increased housing and medical costs as petitioners age.

In the remaining letters, petitioners alleged that their case was a "longstanding" case and argued that interest should be compromised due to the longstanding nature of the case.

On May 21, 2004, petitioners submitted another letter to Ms. Cochran, which included 42 exhibits not previously provided.

On September 27, 2004, respondent issued petitioners a notice of determination. In evaluating petitioners' offer-in-compromise, respondent made the following changes to the values of assets reported by petitioners on the Form 433-A: (1) Respondent determined that the house was worth $275,250 instead of $220,200 (the 80-percent quick-sale value reported by petitioners) and reduced petitioners' net realizable equity by

---

[9] Mr. Carter also broke his back in a work-related accident on June 21, 2005, but by the time of trial, he was back to working full-time.

$82,009 to $193,241 to reflect the amount outstanding on the first and second mortgages; (2) respondent included the quick-sale value of the 1997 Ford Expedition ($6,120) instead of the fair market value petitioners reported; and (3) respondent did not include the reported value of petitioners' personal effects. Respondent did not include the value of Mr. Carter's pension but instead used the pension as a source of future income, as described below. Respondent concluded that petitioners had a total net realizable equity of $218,267.

Using Mr. Carter's Form W-2, Wage and Tax Statement, from 2003, respondent adjusted Mr. Carter's gross monthly income upward to $4,941. Based on representations made by petitioners, respondent determined that Mr. Carter would retire in February 2008 and thus included 41 months of Mr. Carter's monthly wages in calculating the amount collectible from future income.[10] Based on the information petitioners provided, respondent determined that upon retirement Mr. Carter would receive $5,170 per month from his pension. Thus, respondent included 45 months of Mr. Carter's pension in calculating the amount collectible from future income.

---

[10] Respondent determined that there were 86 months left on the collection statute, and thus used 41 months of petitioners' preretirement income and 45 months of petitioners' postretirement income to calculate the amount collectible from future income.

Using Mrs. Carter's pay stubs from the first two months of 2004, respondent adjusted Mrs. Carter's gross monthly income upward to $916. Respondent included only 41 months of Mrs. Carter's future income.

Respondent accepted petitioners' monthly expenses as reported but adjusted their housing and utilities expense and tax expense downward to $1,170 and $915, respectively. Regarding the possible future increases in expenses outlined in petitioners' May 14, 2004 letters, respondent determined that these were "general projections from the taxpayers' representative and may never, in fact, be incurred" and thus did not take them into account.

After making adjustments to petitioners' monthly income and expenses, respondent determined that $162,439 was collectible from petitioners' future income. Respondent concluded that petitioners had the ability to pay $380,706.

Because petitioners had the ability to pay substantially more than the amount offered, respondent rejected their offer-in-compromise based on doubt as to collectibility with special circumstances. Respondent also rejected petitioners' effective tax administration offer-in-compromise based on economic hardship because they had the ability to pay their tax liability in full. Finally, respondent rejected petitioners' effective tax administration offer-in-compromise based on public policy or

equity ground because the case "fails to meet the criteria for such consideration".

Respondent concluded that petitioners did not offer an acceptable collection alternative, that all requirements of law and administrative procedure had been met, and that the proposed collection action could proceed.

In response to the notice of determination, petitioners filed a petition with this Court on October 29, 2004.

OPINION

Section 7122(a) provides that "The Secretary may compromise any civil * * * case arising under the internal revenue laws". Whether to accept an offer-in-compromise is left to the Secretary's discretion. Fargo v. Commissioner, 447 F.3d 706, 712 (9th Cir. 2006), affg. T.C. Memo. 2004-13; sec. 301.7122-1(c)(1), Proced. & Admin. Regs.

The regulations under section 7122(a) set forth three grounds for the compromise of a tax liability: (1) Doubt as to liability; (2) doubt as to collectibility; or (3) promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Doubt as to liability is not at issue in this case.[11]

---

[11] While petitioners contest their liability for sec. 6621(c) interest, see supra note 2, they did not raise doubt as to liability as a basis for their offer-in-compromise.

The Secretary may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the assessed liability. Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. Generally, under the Commissioner's administrative pronouncements, an offer-in-compromise based on doubt as to collectibility will be acceptable only if it reflects the taxpayer's reasonable collection potential. Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. In some cases, the Commissioner will accept an offer of less than the reasonable collection potential if there are "special circumstances". Id. Special circumstances are: (1) Circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the reasonable collection potential; or (2) circumstances justifying acceptance of an amount less than the reasonable collection potential of the case based on public policy or equity considerations. See Internal Revenue Manual (IRM) sec. 5.8.4.3(4). However, in accordance with the Commissioner's guidelines, an offer-in-compromise based on doubt as to collectibility with special circumstances should not be accepted if the taxpayer does not offer an acceptable amount. See IRM sec. 5.8.11.2.1(11) and .2(12).

The Secretary may also compromise a tax liability on the ground of effective tax administration when: (1) Collection of

- 14 -

the full liability will create economic hardship; or (2)

exceptional circumstances exist such that collection of the full

liability would undermine public confidence that the tax laws are

being administered in a fair and equitable manner; and (3)

compromise of the liability would not undermine compliance by

taxpayers with the tax laws.  Sec. 301.7122-1(b)(3), Proced. &

Admin. Regs.

Petitioners proposed an offer-in-compromise based

alternatively on doubt as to collectibility with special

circumstances or effective tax administration.  Petitioners

offered to pay $99,851 to compromise their outstanding tax

liabilities for 1981 through 1996, which totaled $187,041 at the

time of the section 6330 hearing.[12]  Petitioners argued that

collection of the full liability would create economic hardship

and would undermine public confidence that the tax laws are being

administered in a fair and equitable manner.  Respondent

determined that petitioners' reasonable collection potential was

$380,706 and that their offer-in-compromise did not meet the

criteria for an offer-in-compromise based on either doubt as to

---

[12] The proposed collection action related to petitioners' outstanding tax liability for 1981-88 only.  Petitioners estimated that their outstanding tax liability for 1981-88 was $143,911.  However, petitioners sought to compromise their outstanding tax liability for not only 1981-88, but also for 1989-96.  To accurately compare their offer amount to their outstanding tax liability, we must therefore consider the total assessed amount for 1981-96, and not for only 1981-88.

collectibility with special circumstances or effective tax administration.

Because the underlying tax liability is not at issue, our review under section 6330 is for abuse of discretion.  See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000).  This standard does not ask us to decide whether in our own opinion petitioners' offer-in-compromise should have been accepted, but whether respondent's rejection of the offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law.  Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Keller v. Commissioner, T.C. Memo. 2006-166; Fowler v. Commissioner, T.C. Memo. 2004-163.  Because the same factors are taken into account in evaluating offers-in-compromise based on doubt as to collectibility with special circumstances and on effective tax administration (economic hardship or considerations of public policy or equity), we consider petitioners' separate grounds for their offer-in-compromise together.  See Murphy v. Commissioner, 125 T.C. 301, 309, 320 n.10 (2005), affd. 469 F.3d 27 (1st Cir. 2006); Barnes v. Commissioner, T.C. Memo. 2006-150.

A.   Economic Hardship

Petitioners assert that Ms. Cochran abused her discretion by rejecting their offer-in-compromise because "There is no indication that SO Cochran gave any substantive consideration to

Petitioners' demonstrated special circumstances or that they would experience a hardship if required to make a full-payment." In support of this assertion, petitioners argue: (1) Ms. Cochran failed to discuss petitioners' special circumstances in the notice of determination; (2) Ms. Cochran erroneously determined petitioners' future income and failed to take into account their future expenses; and (3) Ms. Cochran improperly valued petitioners' house.

Section 301.6343-1(b)(4)(i), Proced. & Admin. Regs., states that economic hardship occurs when a taxpayer is "unable to pay his or her reasonable basic living expenses." Section 301.7122-1(c)(3), Proced. & Admin. Regs., sets forth factors to consider in evaluating whether collection of a tax liability would cause economic hardship, as well as some examples. One of the examples involves a taxpayer who provides fulltime care to a dependent child with a serious long-term illness. A second example involves a taxpayer who would lack adequate means to pay his basic living expenses were his only asset to be liquidated. A third example involves a disabled taxpayer who has a fixed income and a modest home specially equipped to accommodate his disability, and who is unable to borrow against his home because of his disability. See sec. 301.7122-1(c)(3)(iii), Examples (1), (2), and (3), Proced. & Admin. Regs. None of these examples bears any resemblance to this case, but instead they "describe

more dire circumstances". <u>Speltz v. Commissioner</u>, 454 F.3d 782, 786 (8th Cir. 2006), affg. 124 T.C. 165 (2005); see also <u>Barnes v. Commissioner</u>, <u>supra</u>. Nevertheless, we address petitioners' arguments.

1. <u>Discussion of Special Circumstances in the Notice of Determination</u>

Petitioners argue that Ms. Cochran failed "to follow proper procedure by discussing Petitioners' special circumstances, what equity was considered in relation to their special circumstances, and how the special circumstances affected her determination of their ability to pay." Petitioners infer that, because the special circumstances were not discussed in detail in the notice of determination, Ms. Cochran failed to adequately take their circumstances into consideration.

We do not believe that Appeals must specifically list in the notice of determination every single fact that it considered in arriving at the determination. See <u>Barnes v. Commissioner</u>, <u>supra</u>. This is especially true in a case such as this, where petitioners provided Ms. Cochran with multiple letters and hundreds of pages of exhibits. As discussed below, Ms. Cochran considered all of the arguments and information presented to her. Given the amount of information, it would be unreasonable to put the burden on Ms. Cochran to specifically address in the notice of determination every single asserted fact, circumstance, and argument presented. The fact that all of the information was not

specifically addressed in the notice of determination was not an abuse of discretion.

2.   Petitioners' Income and Future Expenses

Petitioners assert that Ms. Cochran erroneously determined their future income and expenses by:  (1) Considering 86 months of petitioners' future income instead of 48 months; and (2) failing to adequately consider their age, health, retirement status, medical costs, and the likelihood of future increases in medical and housing costs.  Petitioners' arguments are not persuasive.

Section 5.8.5.5 of the IRM provides that, when a taxpayer makes a cash offer to compromise an outstanding tax liability, only 48 months of future income should be considered. Petitioners made a cash offer, but Ms. Cochran used 86 months of future income.[13]  At trial, Ms. Cochran acknowledged that she should have used only 48 months of future income.  Ms. Cochran recomputed petitioners' reasonable collection potential using 48 months and determined that it was $304,782, instead of $380,706, as reflected in the notice of determination.  Ms. Cochran testified that the change would not have had an effect on her final determination because, using either calculation, petitioners' reasonable collection potential was greater than

---

[13]   Ms. Cochran included 41 months of petitioners' future wage income and 45 months of Mr. Carter's future monthly pension payments.

their offer amount ($99,851). We find that Ms. Cochran's error did not amount to an abuse of discretion because, even when the error is corrected, petitioners' reasonable collection potential of $304,782 far exceeds their offer amount of $99,851.

With regard to age, health, and retirement status, petitioners' argument is not supported by the record. On their Form 433-A, petitioners reported monthly medical expenses of $212. In their May 14, 2004, letter describing their offer amount, petitioners represented that Mr. Carter would retire at age 58. While they outlined Mrs. Carter's medical conditions, petitioners gave no indication as to the likelihood of her retirement.

Ms. Cochran accepted petitioners' monthly medical expenses without change. Ms. Cochran also accepted petitioners' representation that Mr. Carter would retire at 58, and thus considered only 41 months of his future income from wages. Despite the lack of an estimated retirement date for Mrs. Carter, Ms. Cochran considered only 41 months of Mrs. Carter's future income from wages.[14] Given her acceptance of the medical expenses as reported and of only 41 months of petitioners' future

---

[14] At the time of the section 6330 hearing, Mrs. Carter was still working. However, at trial, Mrs. Carter testified that she was forced to quit work shortly after the section 6330 hearing due to her medical conditions and does not plan to return to work. Ms. Cochran could not have considered that Mrs. Carter was forced to stop working because this did not occur until after the hearing.

income from wages, we reject petitioners' assertion that Ms. Cochran failed to consider each petitioner's age, health, retirement status, and current medical costs.

Petitioners' argument is also unavailing with regard to the likelihood of future increases in medical and housing costs. Petitioners did not inform Ms. Cochran with any specificity that they would have to pay a greater amount of unreimbursed medical expenses in the future, or that their housing expenses would increase. Instead, they made general assertions about the increase of medical costs as people age and about the need for some seniors to seek in-home care or nursing home care or to make their houses handicapped accessible.

As reflected in the notice of determination, Ms. Cochran took into consideration the information petitioners presented, but concluded that "these possible future expenses are general projections from the taxpayers' representative and may never, in fact, be incurred. The present offer, therefore, must be considered within the framework of present facts." Given the information presented to her, it was not arbitrary or capricious for Ms. Cochran to ignore these speculative future costs in making her final determination.

Petitioners also assert that Ms. Cochran abused her discretion by using Mr. Carter's pension in her calculation of petitioners' future income. Petitioners argue that they must

retain the money received from the pension to pay for future increases in expenses.  As discussed above, petitioners' assertions regarding future expenses are speculative and unsupported, and it was not arbitrary or capricious for Ms. Cochran to ignore such costs.  The use of Mr. Carter's monthly pension payments in calculating petitioners' reasonable collection potential was not arbitrary or capricious.

Petitioners also raise challenges to various other determinations made by Ms. Cochran, including:  (1) The increase of petitioners' wages from the amounts reported; (2) the reduction of their housing expense and tax expense; and (3) the disallowance of $600 in monthly insurance payments.[15]  We need not discuss in detail these and other minor disputes raised by petitioners.  Even assuming arguendo that petitioners' income, expenses, and value of assets should have been accepted as reported, we would not find that Ms. Cochran abused her discretion in rejecting petitioners' offer-in-compromise.  Ms. Cochran testified that, had she accepted the income, expenses, and value of assets as reported, petitioners' reasonable collection potential would have been $173,406.  This amount

---

[15]  The monthly insurance payments were not reported by petitioners on their Form 433-A, but instead were discussed in their May 14, 2004, letter regarding the offer amount. Petitioners were covered by insurance through Mr. Carter's employment.  However, they would not be covered once he retired. Apparently, the $600 payment reflects petitioners' estimate of their monthly insurance payments once Mr. Carter retires.

includes only 80 percent of the value of petitioners' house, discussed in more detail below, and does not include the value of any future pension payments.

Respondent may accept an offer-in-compromise based on doubt as to collectibility with special circumstances or on effective tax administration even if the offer amount is less than petitioners' reasonable collection potential. However, given all other considerations discussed herein, we do not believe that Ms. Cochran abused her discretion by rejecting an offer-in-compromise that bore no relationship to petitioners' ability to pay based on their own calculations.

3.   The Value of Petitioners' House

Petitioners argue that Ms. Cochran improperly valued their house. Petitioners also argue that Ms. Cochran failed to take into consideration the need for repairs. Petitioners' arguments are not persuasive.

On their Form 433-A, petitioner reported that their house had an estimated 80-percent quick-sale value of $220,200. Ms. Cochran increased the house's value to reflect its 100-percent value, $275,250. Petitioners argue that, if there was a dispute over value, Ms. Cochran should have hired a professional valuation expert. Petitioners argument is without merit because there was no dispute over value. Ms. Cochran accepted the value reported by petitioners, only adjusting it to reflect the house's

100 percent value.  Petitioners offer no support for their use of an 80-percent quick-sale value.  We find that Ms. Cochran's use of 100 percent of the house's value was not arbitrary or capricious.

In one of the May 14, 2004, letters, petitioners listed a variety of problems with their house.  However, petitioners did not provide any supporting documentation regarding the need for or the cost of repairs, but instead they invited Ms. Cochran to view the house in person.  Petitioners believe that, despite the lack of supporting documentation, Ms. Cochran abused her discretion by not factoring in the cost of repairs.  Petitioners assert that, if Ms. Cochran questioned petitioners' representations, she could have requested more information or accepted petitioners' invitation to view the house in person.  Given the voluminous nature of the information provided to Ms. Cochran, we do not believe that she was under an obligation to request more information or to view the house in person.  The burden was on petitioners to establish that they were entitled to an offer-in-compromise.  Petitioners cannot shift this burden by simply inviting Ms. Cochran to request more information or to view the house in person.

4.   Encouraging Voluntary Compliance With the Tax Laws

We are also mindful that any decision by Ms. Cochran to accept petitioners' offer-in-compromise due to doubt as to

collectibility with special circumstances or effective tax administration based on economic hardship must be viewed against the backdrop of section 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.[16] See Barnes v. Commissioner, T.C. Memo. 2006-150. That section requires that Ms. Cochran deny petitioners' offer-in-compromise if its acceptance would undermine voluntary compliance with tax laws by taxpayers in general. Thus, even if we were to assume arguendo that petitioners would suffer economic hardship, a finding that we decline to make, we would not find that Ms. Cochran's rejection of petitioners' offer-in-compromise was an abuse of discretion. As discussed below (in our discussion of petitioners' "equitable facts" argument), we conclude that acceptance of petitioners' offer-in-compromise would undermine voluntary compliance with tax laws by taxpayers in general.

B.    Public Policy and Equity Considerations

Petitioners assert that "There are so many unique and equitable facts in this case that this case is an exceptional circumstance", and respondent abused his discretion by not accepting those facts as grounds for an offer-in-compromise. In support of their assertion, petitioners argue: (1) The

---

[16] The prospect that acceptance of an offer-in-compromise will undermine compliance with the tax laws militates against its acceptance whether the offer-in-compromise is predicated on promotion of effective tax administration or on doubt as to collectibility with special circumstances. See Rev. Proc. 2003-71, 2003-2 C.B. 517; IRM sec. 5.8.11.2; see also Barnes v. Commissioner, T.C. Memo. 2006-150.

longstanding nature of this case justifies acceptance of the offer-in-compromise; (2) respondent's reliance on an example in the IRM was improper; and (3) respondent failed to consider petitioners' other "equitable facts".

1.  Longstanding Case

Petitioners assert that the legislative history requires respondent to resolve "longstanding" cases by forgiving penalties and interest which would otherwise apply.  Petitioners argue that, because this is a longstanding case, respondent abused his discretion by failing to accept their offer-in-compromise.

Petitioners' argument is essentially the same considered and rejected by the Court of Appeals for the Ninth Circuit in Fargo v. Commissioner, 447 F.3d at 711-712.  See also Keller v. Commissioner, T.C. Memo. 2006-166; Barnes v. Commissioner, supra. We reject petitioners' argument for the same reasons stated by the Court of Appeals.  We add that petitioners' counsel participated in the appeal in Fargo, as counsel for the amici. On brief, petitioners suggests that the Court of Appeals knowingly wrote its opinion in Fargo in such a way as to distinguish that case from the cases of counsel's similarly situated clients (e.g., petitioners), and to otherwise allow those clients' liabilities for penalties and interest to be forgiven.  We do not read the opinion of the Court of Appeals in

Fargo to support that conclusion.  See Keller v. Commissioner, supra; Barnes v. Commissioner, supra.

Respondent's rejection of petitioners' longstanding case argument was not arbitrary or capricious.

2.    The IRM Example

Petitioners argue that respondent erred when he determined that they were not entitled to relief based on the second example in IRM section 5.8.11.2.2.  Petitioners assert that many of the facts in this case were not present in the example, and, therefore, any reliance on the example was misplaced. Petitioners' argument is not persuasive.

IRM section 5.8.11.2.2 discusses effective tax administration offers-in-compromise based on equity and public policy grounds and states in the second example:

> In 1983, the taxpayer invested in a nationally marketed partnership which promised the taxpayer tax benefits far exceeding the amount of the investment. Immediately upon investing, the taxpayer claimed investment tax credits that significantly reduced or eliminated the tax liabilities for the years 1981 through 1983.  In 1984, the IRS opened an audit of the partnership under the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA).  After issuance of the Final Partnership Administrative Adjustment (FPAA), but prior to any proceedings in Tax Court, the IRS made a global settlement offer in which it offered to concede a substantial portion of the interest and penalties that could be expected to be assessed if the IRS's determinations were upheld by the court.  The taxpayer rejected the settlement offer. After several years of litigation, the partnership level proceeding eventually ended in Tax Court decisions upholding the vast majority of the deficiencies asserted in the FPAA on the grounds that

the partnership's activities lacked economic substance. The taxpayer has now offered to compromise all the penalties and interest on terms more favorable than those contained in the prior settlement offer, arguing that TEFRA is unfair and that the liabilities accrued in large part due to the actions of the Tax Matters Partner (TMP) during the audit and litigation. Neither the operation of the TEFRA rules nor the TMP's actions on behalf of the taxpayer provide grounds to compromise under the equity provision of paragraph (b)(4)(i)(B) of this section. Compromise on those grounds would undermine the purpose of both the penalty and interest provisions at issue and the consistent settlement principles of TEFRA. * * *

1 Administration, Internal Revenue Manual (CCH), sec. 5.8.11.2.2(3), at 16,378. Ms. Cochran determined that petitioners' case is similar to the example:

It's similar to the case at hand in that it involved old periods, 1983 periods. It's similar in the sense that * * * it was a TEFRA proceedings [sic] involving an audit of a partnership. The taxpayer was offered and rejected a settlement officer [sic] from IRS. After several years of litigation, the partnership ended up in Tax Court. * * * FPAAs were issued. The taxpayer now offered to compromise all the penalties and interest on terms more favorable than those originally contained in the settlement offer[17] and that there--the taxpayer raised issues about the TMP's actions on behalf of the taxpayer.

We agree with Ms. Cochran that the example presents circumstances similar to those in petitioners' case.

Petitioners are correct in asserting that not all of the facts in their case are present in the example. However, it is

---

[17] Mr. Carter testified that they received a settlement offer from respondent in or around 1990. Mr. Carter could not remember the details of the settlement offer, nor was the offer in the record.

unreasonable to expect that facts in an example be identical to facts of a particular case before the example can be relied upon. The IRM example was only one of many factors respondent considered. Given the similarities to petitioners' case, respondent's reliance on that example was not arbitrary or capricious.

    3.    Petitioners' Other "Equitable Facts"

Petitioners argue that respondent abused his discretion by failing to consider the other "equitable facts" of this case. Petitioners' "equitable facts" include reference to: (1) Petitioners' reliance on Bales v. Commissioner, T.C. Memo. 1989-568;[18] (2) petitioners' reliance on Hoyt's enrolled agent status; (3) Hoyt's criminal conviction; (4) Hoyt's fraud on petitioners; and (5) other letters and cases. The basic thrust of petitioners' argument is that they were defrauded by Hoyt and that, if they were held responsible for penalties and interest

---

    [18]    Bales v. Commissioner, T.C. Memo. 1989-568, involved deficiencies determined against various investors in several Hoyt partnerships. This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes." Taxpayers in many Hoyt-related cases have used Bales as the basis for a reasonable cause defense to accuracy-related penalties. This argument has been uniformly rejected by this Court and by the Courts of Appeals for the Sixth, Ninth, and Tenth Circuits. See, e.g., Hansen v. Commissioner, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; Mortensen v. Commissioner, 440 F.3d 375, 390-391 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243, 1254-1256 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

- 29 -

incurred as a result of their investment in a tax shelter, it would be inequitable and against public policy. Petitioners' argument is not persuasive.

While the regulations do not set forth a specific standard for evaluating an offer-in-compromise based on claims of public policy or equity, the regulations contain two examples. See sec. 301.7122-1(c)(3)(iv), Examples (1) and (2), Proced. & Admin. Regs. The first example describes a taxpayer who is seriously ill and unable to file income tax returns for several years. The second example describes a taxpayer who received erroneous advice from the Commissioner as to the tax effect of the taxpayer's actions. Neither example bears any resemblance to this case. Unlike the exceptional circumstances exemplified in the regulations, petitioners' situation is neither unique nor exceptional in that his situation mirrors those of numerous other taxpayers who claimed tax shelter deductions in the 1980s and 1990s. See Keller v. Commissioner, T.C. Memo. 2006-166; Barnes v. Commissioner, T.C. Memo. 2006-150.

Of course, the examples in the regulations are not meant to be exhaustive, and petitioners have a more sympathetic case than the taxpayers in Fargo v. Commissioner, 447 F.3d at 714, for whom the Court of Appeals for the Ninth Circuit noted that "no evidence was presented to suggest that Taxpayers were the subject of fraud or deception". Such considerations, however, have not

kept this Court from finding investors in the Hoyt tax shelters to be liable for penalties and interest, nor have they prevented the Courts of Appeals for the Sixth, Ninth, and Tenth Circuits from affirming our decisions to that effect. See Hansen v. Commissioner, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; Mortensen v. Commissioner, 440 F.3d 375 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

Ms. Cochran testified that she considered all of Ms. Merriam's and petitioners' assertions, including the numerous letters and exhibits. Nevertheless, Ms. Cochran determined that petitioners did not qualify for an offer-in-compromise.

The mere fact that petitioners' "equitable facts" did not persuade respondent to accept their offer-in-compromise does not mean that those assertions were not considered. The notice of determination and Ms. Cochran's testimony demonstrate respondent's clear understanding and careful consideration of the facts and circumstances of petitioners' case. We find that respondent's determination that the "equitable facts" did not justify acceptance of petitioners' offer-in-compromise was not arbitrary or capricious, and thus it was not an abuse of discretion.

We also find that compromising petitioners' case on grounds of public policy or equity would not enhance voluntary compliance

by other taxpayers. A compromise on that basis would place the Government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which they enter. It would be particularly inappropriate for the Government to play that role here, where the transaction at issue is participation in a tax shelter. Reducing the risks of participating in tax shelters would encourage more taxpayers to run those risks, thus undermining rather than enhancing compliance with the tax laws. See Barnes v. Commissioner, supra.

C. Petitioners' Other Arguments

1. Compromise of Penalties and Interest in an Effective Tax Administration Offer-in-Compromise

Petitioners advance a number of arguments focusing on their assertion that respondent determined that penalties and interest could not be compromised in an effective tax administration offer-in-compromise. Petitioners argue that such a determination is contrary to legislative history and is therefore an abuse of discretion. These arguments are not persuasive.

The regulations under section 7122 provide that "If the Secretary determines that there are grounds for compromise under this section, the Secretary may, at the Secretary's discretion, compromise any civil * * * liability arising under the internal revenue laws". Sec. 301.7122-1(a)(1), Proced. & Admin. Regs. In

other words, the Secretary may compromise a taxpayer's tax liability if he determines that grounds for a compromise exist. If the Secretary determines that grounds do not exist, the amount offered (or the way in which the offer is calculated) need not be considered.

Petitioners' arguments regarding the compromise of penalties and interest do not relate to whether there are grounds for a compromise. Instead, these arguments go to whether the amount petitioners offered to compromise their tax liability was acceptable. As addressed above, respondent's determination that the facts and circumstances of petitioners' case did not warrant acceptance of their offer-in-compromise was not arbitrary or capricious and was thus not an abuse of discretion. Because no grounds for compromise exist, we need not address whether respondent can or should compromise penalties and interest in an effective tax administration offer-in-compromise. See Keller v. Commissioner, supra.

2.    Information Sufficient for the Court To Review
      Respondent's Determination

Petitioners argue that respondent failed to provide the Court with sufficient information "so that this Court can conduct a thorough, probing, and in-depth review of respondent's determinations." Petitioners' argument is without merit.

Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect. Rule 142(a)(1); Welch

v. Helvering, 290 U.S. 111, 115 (1933).[19]  The burden was on petitioners to show that respondent abused his discretion.  The burden was not on respondent to provide enough information to show that he did not abuse his discretion.  Nevertheless, we find that we had more than sufficient information to review respondent's determination.

    3.    Scheduling of the Section 6330 Hearing and Deadline for Submission of Information

Petitioners argue that Ms. Cochran abused her discretion by not allowing their counsel additional time to prepare for the section 6330 hearing and to submit additional information.  Once the section 6330 hearing was scheduled, Ms. Cochran refused petitioners' request to delay the hearing.  However, Ms. Cochran did extend the deadline for submission of information.

While petitioners wanted to delay the section 6330 hearing, they do not allege that they were unable to adequately prepare for the hearing.  Additionally, petitioners have not identified any documents or other information that they believe Ms. Cochran should have considered but that they were unable to produce because of the deadline for submission.  Given the thoroughness

---

[19]  While sec. 7491 shifts the burden of proof and/or the burden of production to the Commissioner in certain circumstances, this section is not applicable in this case because respondent's examination of petitioners' returns did not commence after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

and the amount of information submitted, it is unclear why petitioners needed additional time. We do not believe that Ms. Cochran abused her discretion by establishing a timeframe for the section 6330 hearing and the submission of information.

### 4. Efficient Collection Versus Intrusiveness

Petitioners argue that respondent failed to balance the need for efficient collection of taxes with the legitimate concern that the collection action be no more intrusive than necessary. See sec. 6330(c)(3)(C). Petitioners' argument is not supported by the record.

Petitioners have an outstanding tax liability. In their section 6330 hearing, petitioners proposed only an offer-in-compromise. Because no other collection alternatives were proposed, there were no less intrusive means for respondent to consider. We find that respondent balanced the need for efficient collection of taxes with petitioners' legitimate concern that collection be no more intrusive than necessary.

### D. Conclusion

Petitioners have not shown that respondent's determination was arbitrary or capricious, or without sound basis in fact or law. For all of the above reasons, we hold that respondent's determination was not an abuse of discretion, and respondent may proceed with the proposed collection action.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.