T.C. Memo. 2016-84

UNITED STATES TAX COURT

JOHN N. ALPHSON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16424-13L.                    Filed May 2, 2016.

Robert Conrad Eroen, for petitioner.

Michael K. Park and Najah J. Shariff, for respondent.

MEMORANDUM OPINION

HOLMES, Judge: John Alphson ran up a tax bill of more than $200,000

from 2008 to 2010. He didn't pay, and in 2012 the Commissioner decided to place

a lien on his property to try to collect. Alphson claimed he couldn't pay the full

amount because of financial problems dating back to the real-estate market

collapse of 2008 and offered to settle for $2,400. The Commissioner rejected the

[*2] offer because he thought Alphson had wasted more than $1 million that he should have used to pay his taxes.

Background

For much of his professional career, up until 2008, Alphson worked in the commercial real-estate industry, owning and operating buildings as well as developing real property. In 2008 he settled an ongoing legal dispute between businesses in which he and family members were involved--the precise nature of the dispute and all its consequences aren't clear from the record, but Alphson did cut formal ties with at least some family entities and was to receive a $1.2 million settlement, paid out over three years--and he eventually received $600,000 in 2008; $460,000 in 2009; and $135,000 in 2010. Alphson also claims that the settlement left him unemployed.

Alphson nevertheless filed tax returns for 2008-2010 that showed significant adjusted gross income:

| Year | Adjusted gross income | Tax |
|------|----------------------|-----|
| 2008 | $237,797 | $87,704 |
| 2009 | 373,553 | 104,952 |
| 2010 | 123,220 | 13,111 |

**[*3]** The Commissioner accepted the returns and assessed the tax shown. See sec. 6201(a)(1).[1]

Alphson, however, never paid. And in March 2010 he filed for bankruptcy. He won a discharge in February 2011, but his tax debt wasn't dischargeable.[2] He tried to settle it with an offer in compromise (OIC) in April 2011. His reason for seeking an OIC was doubt as to collectibility, tax-speak for not being able to pay the tax because his liabilities and living expenses exceeded the value of his assets and future income. He offered to pay $2,400 to settle his tax debt, which at that time (before he filed his 2010 tax return and the Commissioner assessed that debt too) would have been just under $200,000. As part of the OIC process, there was a back-and-forth exchange of requests and financial information, but the gist of Alphson's argument was that he was unemployed and unable to find any work after three years, had practically no assets, and needed to pay thousands of dollars

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue and all rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[2] 11 U.S.C. section 523(a)(1)(A) (2012) exempts from discharge federal income taxes that have a return filing due date (including extensions) within the three years before the bankruptcy filing date. It also exempts from discharge taxes that are assessable after the start of the bankruptcy case. Id. sec. 507(a)(8)(A)(i), (iii). These provisions govern the three tax years.

[*4] in monthly expenses. An OIC specialist ultimately rejected Alphson's offer in June 2012 because she determined he could pay more than $2,400.

While one part of the IRS mulled over Alphson's OIC, another part was moving ahead with collection and in March 2012 notified Alphson that it had filed a notice of federal tax lien (NFTL) against his property. The Commissioner's notice of NFTL filing and rejection of Alphson's OIC then converged. Alphson asked for a collection due process (CDP) hearing in April to challenge the lien. He claimed that he couldn't pay the tax and that the IRS should not have rejected his OIC. The settlement officer who conducted the CDP hearing met Alphson and his lawyer for a face-to-face meeting in October 2012. He also conducted his own review of the information which Alphson had submitted to support his OIC, but he ultimately rejected the offer and sustained the NFTL filing. Alphson then appealed to this Court. He argues that the settlement officer abused his discretion by ignoring relevant facts and incorrectly calculating his assets and future income.

At calendar call in Los Angeles we granted the parties' motion to submit this case without trial pursuant to Rule 122. We must decide whether the settlement officer abused his discretion by rejecting Alphson's offer of $2,400 to settle his tax liability of more than $200,000.

**[\*5]** When the case was submitted Alphson was 54 years old. He was also still a California resident, as he was when he filed his petition. He was married when he made his initial OIC in 2011, but he now claims he is not.

Discussion

Section 7122(d)(1) gives the Commissioner wide discretion to accept compromise offers and to prescribe guidelines "to determine whether an offer-in-compromise is adequate and should be accepted." Offers in compromise come in three flavors: (1) doubt as to liability (when there's a genuine dispute about the existence or amount of a tax debt), (2) doubt as to collectibility (when a taxpayer's assets and income are insufficient to pay the full debt), and (3) the promotion of effective tax administration (when collection would cause economic hardship to the taxpayer or compelling public policy or equitable considerations favor compromise). Sec. 301.7122-1(b), Proced. & Admin. Regs. The Code leaves the decision to accept or reject an OIC to the Commissioner's discretion, but his decision should be based on all the facts and circumstances relevant to the offer. Id. para. (c)(1).

Alphson's offer was based on doubt as to collectibility. The Commissioner has said that he'll accept an OIC based on doubt as to collectibility when it's unlikely that he can collect the unpaid tax liability in full and the offer reflects the

**[\*6]** taxpayer's reasonable collection potential (RCP).  See Internal Revenue

Manual (IRM) pt. 5.8.4.3 (June 1, 2010).  The RCP is a key concept in this corner

of tax law, but it's easy to understand:  A taxpayer's RCP is the amount that the

IRS thinks it can get from his assets and income.  The IRM explains in exhaustive

detail how to calculate a taxpayer's RCP, and while the process is complicated, its

guiding principle and purpose are simple:  The Commissioner estimates how much

he can collect by selling a taxpayer's property and garnishing his income while

allowing for certain necessary expenses.  We can even come up with a Hand

formula:  RCP > OIC = NO.  See United States v. Carroll Towing Co., 159 F.2d

169, 173 (2d Cir. 1947).  Though as always in tax law, there are some exceptions,

and under some circumstances that "no" can become a "yes".  See IRM pt. 5.8.4.3.

Alphson challenges the settlement officer's rejection of his OIC.  Our

standard of review in such a case depends on whether his underlying tax liability

was at issue.  Alphson wants to challenge his underlying tax liability--in his

petition he states he "is challenging the underlying tax liability assessed by the

IRS."  The problem, however, is that he didn't raise the issue any time before or

during his CDP hearing.  Nowhere in his request for a hearing did he indicate that

he wanted to challenge his liability; he raised only his claimed inability to pay.

And when Alphson and his attorney met in person with the CDP settlement

**[\*7]** officer, they stated that Alphson didn't challenge his underlying tax liability. That's enough to knock that issue out of this case: Since Alphson never raised the issue of liability during his hearing, he can't do so now. See Giamelli v. Commissioner, 129 T.C. 107, 113 (2007).

That means that the only issue left is whether the settlement officer should have accepted Alphson's OIC. Our standard of review for this issue is abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000). We don't decide whether in *our* opinion the settlement officer should have accepted Alphson's OIC, but whether the settlement officer abused his discretion when he rejected it. See Woodral v. Commissioner, 112 T.C. 19, 23 (1999). A settlement officer abuses his discretion if his decision was grounded on an error of law or rested on a clearly erroneous finding of fact, or if he ruled irrationally. See Fargo v. Commissioner, 447 F.3d 706, 709 (9th Cir. 2006), aff'g T.C. Memo. 2004-13; United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001).

To make a proper determination a settlement officer at a CDP hearing must verify that the requirements of applicable law and administrative procedure were met, consider issues properly raised by the taxpayer, and decide whether the collection action balances the need for efficient tax collection with the taxpayer's

**[\*8]** legitimate concerns. Sec. 6330(c)(3). At his CDP hearing, Alphson raised the issue of his OIC based on doubt as to collectibility. In his petition to this Court, he argues that the settlement officer erred in calculating his RCP and therefore erred in rejecting his offer.

We turn, then, to the calculation of Alphson's RCP.

The main components of a taxpayer's RCP are his realizable net equity in his assets and his net future income. See Johnson v. Commissioner, 136 T.C. 475, 485 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013); IRM pt. 5.8.11.2 (Sept. 23, 2008). The settlement officer calculated Alphson's RCP to be over $3 million, far more than the $2,400 offer. Alphson argues that the settlement officer erred greatly in his calculation of both components, and we'll look at each.

We note at the start that the IRS tells taxpayers that it will give full consideration to their overall situation, including such factors as age, health, education, and occupational training, IRM pt. 5.8.4.3(2) (June 1, 2010), all as of the time the taxpayer submitted his OIC, id. pt. 5.8.5.3(1) (Oct. 22, 2010). The process necessarily requires some estimation. We're certainly aware of the longstanding rule that the IRM doesn't have the force of law, but because section 7122 gives such wide discretion to the Commissioner to establish guidelines for evaluating OICs, we've generally upheld a settlement officer's determination

**[*9]** rejecting an OIC as reasonable when he follows the IRM. <u>Atchison v. Commissioner</u>, T.C. Memo. 2009-8. And even if the officer makes some errors in calculating the RCP, we have upheld a determination when the taxpayer's OIC was far less than the correct RCP. <u>See</u> <u>Carter v. Commissioner</u>, T.C. Memo. 2007-25, <u>aff'd in part, vacated in part sub nom.</u> <u>Keller v. Commissioner</u>, 568 F.3d 710 (9th Cir. 2009).

## I.    Net Equity

The settlement officer determined that Alphson had net realizable equity in assets of more than $1.5 million, even though Alphson said on his Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, that he had only $501 in total available assets. (He also said in his appeal from the IRS's initial rejection of his OIC that he really had a negative net worth of $500,000.) The settlement officer's calculation of Alphson's assets includes a number of bank accounts and cash deposits that Alphson didn't include, but by far the largest asset is the $1,195,000 Alphson collected as a result of his settlement. We focus on this amount--if it's includible in Alphson's RCP, it alone is so much greater than $2,400 that it justifies rejection of the OIC.

No one disputes the basic facts about this settlement. Both parties agree that Alphson received three payments--one in 2008, one in 2009, and one in 2010.

[*10] Both also agree that Alphson doesn't have any of this money because he spent it. The parties don't agree, however, about whether all or some of it should still be included in Alphson's RCP. This is a dispute, in other words, about whether or not the settlement proceeds are a dissipated asset.

A dissipated asset is any asset (liquid or illiquid) that has been "sold, transferred, or spent on non-priority items or debts and that is no longer available to pay the tax liability." Johnson, 136 T.C. at 487. If a taxpayer can substantiate claims that he used dissipated assets for necessary living expenses, the Commissioner shouldn't include them in the taxpayer's RCP. Id. Ascribing dissipated assets to someone results in a legal fiction that may seem harsh: It treats a taxpayer as having money that he actually doesn't. But not including dissipated assets in RCP would create a perverse incentive to be profligate: A taxpayer with a large tax debt could waste his money on nonessential goods and then plead poverty when the taxman came. Including dissipated assets in RCP solves this *chutzpah* problem. See Alex Kozinski & Eugene Volokh, "Lawsuit, Shmawsuit," 103 Yale L.J. 463, 467 (1993) (defining "*chutzpah*").

The IRM provides specific guidance on how to calculate and when to include dissipated assets in a taxpayer's RCP, but the parties disagree about what version of the IRM to apply. Alphson cites the IRM for the principle that

**[*11]** "inclusion of dissipated assets in * * * RCP is no longer applicable, except in situations where it can be shown the taxpayer has sold, transferred, encumbered, or otherwise disposed of assets in an attempt to avoid the payment of the tax liability." IRM pt. 5.8.5.18(1) (Sept. 30, 2013). He argues that the Commissioner hasn't shown he spent the settlement proceeds with the intent of avoiding payment of his taxes. This is true, and he accurately quotes *part* of the *current* IRM, but his overall argument is misguided.

First, he cites an IRM provision that was added in September 2013. Alphson renewed his initial OIC when he sent his CDP hearing request to the IRS in April 2012. The settlement officer rejected the OIC and issued his notice of determination in June 2013. The relevant IRM provisions on dissipated assets remained the same throughout the process, which ended before the IRM was changed in September 2013. So at all relevant times, the settlement officer would've been applying a different version of the IRM.

That version provides in relevant part that while dissipated assets shouldn't automatically be included in calculating RCP, if a taxpayer used assets on nonpriority items the officer should determine what portion of the value of the asset is appropriate to include in the taxpayer's RCP. IRM pt. 5.8.5.16 (Oct. 22, 2010). The inclusion of dissipated assets must clearly be justified in the case file,

[*12] and the determination should analyze facts such as when the assets were dissipated in relation to the tax liability and the OIC, with a general rule of considering only assets dissipated within five years of the offer. Id. In the earlier version of the IRM, as with the current one, the officer shouldn't include assets that were used to fund necessary living expenses. Notably absent from this version of the IRM is a presumption against including dissipated assets unless the officer shows an attempt to avoid paying the tax.

When we consider the 2010 requirements, we find that the settlement officer followed the IRM.[3] The settlement officer independently considered Alphson's settlement proceeds as documented by the OIC specialist. He looked at when Alphson received the settlement proceeds and when he incurred his tax liabilities. After he tentatively concluded that Alphson had dissipated assets that could have paid his tax bill, he gave Alphson another chance to respond. And here we get to Alphson's main argument. He says that he didn't dissipate any assets because he used them for necessary expenses. He gave the settlement officer a table of those expenses and pages of photocopied checks to substantiate his claim. The list:

---

[3] Alphson's OIC was first rejected by an OIC specialist. We review for abuse of discretion during the CDP hearing, so the initial rejection has no bearing on our review. What's important is the settlement officer's determination. See, e.g., Taylor v. Commissioner, T.C. Memo. 2009-27; Lloyd v. Commissioner, T.C. Memo. 2008-15.

| [*13] Year | Legal fees | Schedule C expenses | Credit card | Living expenses | Total |
|---|---|---|---|---|---|
| 2008 | $109,871 | $40,053 | $184,968 | $244,935 | $579,827 |
| 2009 | -0- | 35,354 | 246,224 | 265,063 | 546,641 |
| 2010 (3 months) | -0- | -0- | 41,104 | 94,351 | 135,455 |
| Total | 109,871 | 75,407 | 472,296 | 604,349 | 1,261,923 |

Alphson argues that these expenses were necessary, and because he used the $1,195,000 to cover part of them, the settlement proceeds aren't a "dissipated asset." His argument fails for a few reasons. First, the table alone isn't adequate substantiation--it doesn't prove he actually spent these amounts or spent them on what he claims. He did provide pages and pages of photocopies of checks, but he didn't sort or organize them by type of expense or purpose. Some seem to be for clearly unnecessary expenses--there are many to various country clubs while others, such as some made out to a lawyer or banks or credit cards, *might* be for necessary expenses, but the checks alone don't show that--the check doesn't say if that lawyer was the one who helped him obtain his settlement (thus earning money) or what the credit cards were used for. Electronic withdrawal records similarly show payments to businesses such as American Express, Chase, or Bank of America, but not what the underlying charges were for. Missing from these

[*14] charts, checks, and bank records are *receipts* that show what he actually bought. Without such information, we can't verify that Alphson was spending money on necessary living or business expenses, and he hasn't substantiated such claims. We can see no error, much less clear error, by a settlement officer who thought likewise.

Even some expenses that are "living expenses" aren't reasonable. In 2008, for at least part of the year, there are checks showing rent payments of $9,700 a month. The settlement officer noticed this and considered it "exorbitant." Alphson, however, gave him no information about what the rent was for and didn't produce his lease agreement. We see no error, much less clear error, in the settlement officer's conclusion that such expenses are exorbitant and far in excess of what a person claiming only one dependent on his 2008 and 2009 tax returns, and none on his 2010 return, would need.[4] The officer who holds the CDP hearing is supposed to follow the IRM as well, and must exercise independent

---

[4] The record is also unclear on how many children Alphson had and whether he was taking care of them. He claimed only one dependent on each of his returns for the years at issue, but in other documents he claimed to have four children living in his household, and his bankruptcy documents list seven children. Three of them are stepchildren, but his wife claimed only one dependent on her return for the same years. Alphson has provided no strong proof one way or the other, besides various documents listing different numbers of children. We can hardly fault the settlement officer for relying on those returns.

[*15] judgment when he determines an RCP. See IRM pts. 8.23.3.1 (Oct. 14, 2011), and 8.23.3.3 (Aug. 28, 2009). The settlement officer did this. The case activity record shows that he did consider the issue of dissipated assets and decided to include the settlement proceeds in the RCP. He reasoned that Alphson had failed to show that he spent the money on necessary expenses--which in context means that he concluded both that Alphson hadn't adequately showed what he spent the money on and that he hadn't showed that what he said he spent the money on was necessary or even reasonable. As a result, the officer rejected the offer.

We can't find any significant errors made by the settlement officer in his determination. The IRM for the years at issue provided that the officer should clearly justify the inclusion of information about dissipated assets in the case file and should analyze facts such as when the assets were dissipated in relation to when the tax liability arose. The officer also shouldn't include assets dissipated more than five years before the offer or assets used to pay for necessary living expenses. IRM pt. 5.8.5.16. On the record before us, the settlement officer followed these requirements at all stages of the process.

Of course, Alphson must have spent *some* money during the years at issue for necessary living expenses. But he didn't give the settlement officer much

**[\*16]** proof. The $9,700 a month for rent in 2008 doesn't count. His records do show expenditures on items such as gas ($196 in March 2008) and phone service ($162.80 to Verizon in July 2010), but these are trivial when compared to the more than $1.2 million that he claims to have spent in 2008-2010. The settlement officer could've reduced the net equity part of the RCP a bit to account for these tiny expenses, but given that Alphson provided so little helpful information, and because he appeared to have other unexplained money coming in during these years that could've covered his living expenses, we can't find that the settlement officer abused his discretion by making a decision grounded on clearly erroneous facts or by ruling irrationally. See Indus. Investors v. Commissioner, T.C. Memo. 2007-93.

Even if the settlement officer allowed Alphson's Schedule C expenses of $75,000, and allowed living expenses of a few thousand dollars a month, there would still be around $1 million of the settlement proceeds that could be includible in Alphson's RCP as a dissipated asset. This would still make the RCP far greater than the offer of $2,400. Even if the settlement officer makes some errors calculating the RCP, we uphold determinations when the taxpayer's OIC was far less than the correct RCP. See, e.g., Carter v. Commissioner, T.C. Memo. 2007-25 (immaterial to use $380,000 instead of $304,000 as future income in

[*17] calculating the RCP when OIC was only $100,000). At the CDP hearing, Alphson said he'd be willing to raise his offer to $24,000, but even that is still far below his RCP once one adds to it any reasonable portion of the dissipated assets.[5]

We therefore find that the settlement officer didn't abuse his discretion by determining the settlement proceeds were a dissipated asset. And we could determine that the settlement officer didn't abuse his discretion by rejecting the OIC based on dissipated assets alone. But, as an alternative ground, we turn to the future-income component of Alphson's RCP.

Future Income

Future income is a calculation of a taxpayer's gross monthly income less necessary expenses for a specific number of months into the future. IRM pt.

---

[5] Alphson's RCP was far below his OIC under many different scenarios, but we will consider just one more. Alphson, as explained above, argues that under the current version of the IRM, dissipated assets should be included only if he spent them with the intent of avoiding tax payments. He quotes the IRM selectively, however. The rest of the provision says to include dissipated assets used for unnecessary items *after* the tax has been assessed or within six months before assessment. IRM pt. 5.8.5.18(1) (Sept. 30, 2013). The Commissioner assessed Alphson's 2008 tax liability on November 23, 2009 and his 2009 liability on May 31, 2010. Under these facts, even if we assume Alphson received all of his 2009 settlement proceeds at the beginning of the year, and therefore before his 2008 or 2009 taxes were assessed, he still received $135,000 in 2010 *after* his first tax assessment, and that would therefore qualify as a dissipated asset. Simply adding $135,000 to Alphson's RCP makes it far in excess of $2,400, or $24,000. We would find that the settlement officer did not abuse his discretion in rejecting the OIC even under this scenario.

[*18] 5.8.5.18(1) (Oct. 22, 2010). The analysis usually begins with the taxpayer's current income at the time of the offer, and the number of months depends on factors like the kind of offer he made and how much time was left for the Commissioner to collect the tax. Id. pt. 5.8.5.23. No one rule controls all circumstances, and the officer should consider any fact about the taxpayer's situation that affects his ability to earn income, such as his age, health, education, and past work experience. Fairlamb v. Commissioner, T.C. Memo. 2010-22; IRM pt. 5.8.5.18(3).

The settlement officer calculated Alphson's future income to be nearly $2.9 million: a gross monthly income of $26,759, minus monthly expenses of $2,690, multiplied by 120 months. Alphson, who claims to have been unemployed and without any income since 2008, says this calculation was grossly incorrect and an abuse of discretion: It's not clear whether some of his arguments are against the calculation of his future income or the inclusion of dissipated assets in his equity, but he does claim to be unable to find work, and he alleges that the settlement officer erred by looking back too far and incorrectly averaging amounts to calculate his future income.

We do find that the settlement officer made some clear errors in calculating Alphson's future income. First, Alphson claims to be unemployed despite his

**[\*19]** "herculean efforts to obtain suitable employment," and he blames this on his age, his low credit rating, and the fact that the real-estate-market was severely depressed after the Great Recession began. Alphson claimed to have a household income of only $1,750, all of which came from his wife. His briefs repeatedly attack the settlement officer's calculation of his future income, but they don't offer an alternative number. Presumably, he thinks it should be zero.

But nowhere in the record is there evidence of Alphson's ever receiving any sort of unemployment benefit, nor of any specific efforts he made to find new work. On his Form 433-A, he showed actual monthly expenses of $5,538, but he never explained how he supported himself. He later claimed to be getting assistance from family, but provided no proof. There is a difference between "unemployed" and "permanently unemployable," and in the past we've found the Commissioner didn't abuse his discretion when deciding that on the basis of a taxpayer's health, education, skills, prior earnings, and professional background that the taxpayer *could* earn future income despite being unemployed at the moment. See Johnson, 136 T.C. at 494. This all shows that the settlement officer didn't abuse his discretion by finding that Alphson would earn *some* future income.

[*20] The settlement officer was, however, much more specific. He calculated Alphson's future income by averaging AGI for 2008 to 2010: $237,797 + $373,553 + $123,220 = $734,570/(3*12) = $20,404. The settlement officer also averaged bank deposits for the three months leading up to the offer, and found an additional $6,355 a month of unexplained deposits, which he added to the previous average to get a gross income of $26,759. He also adjusted Alphson's claimed monthly expenses:[6]

| Expense type | Claimed | Allowed | Difference |
|---|---|---|---|
| Food & clothing | $1,500 | $534 | $966 |
| Housing & utilities | 550 | 550 | -0- |
| Vehicle loan/lease | 730 | 496 | 234 |
| Vehicle operating cost | 792 | 295 | 497 |
| Public transportation | 15 | -0- | 15 |
| Health Insurance | 755 | 755 | -0- |
| Other Health Care | 350 | 60 | 290 |
| Child care | 400 | -0- | 400 |
| Total | 5,092 | 2,690 | 2,402 |

---

[6] The expenses Alphson included with his initial offer don't match the expenses that he claimed he spent the settlement proceeds on. This also supports the settlement officer's finding that Alphson's numbers couldn't be trusted.

[*21] The settlement officer subtracted the $2,690 in allowed expenses from the $26,759 in gross monthly income to arrive at a net monthly income of $24,069. And he multiplied this by 120 months because he concluded that there were still about 10 years left to collect the tax.

Alphson points us to a number of IRM provisions that he argues the settlement officer misapplied. He repeatedly cites the wrong version of the IRM, however, so we will review the settlement officer's work under the relevant IRM provisions.

For the years at issue, part 5.8.5.18 provided most of the guidance for calculating future income. It says that when a taxpayer has been unemployed for a long time, his current income should be used and the officer shouldn't average income, and shouldn't use anticipated future income if the taxpayer's future employment is uncertain. Id. pt. 5.8.5.18(4). If a taxpayer has irregular earnings, then the officer should use average income. Id. But, in all cases the officer should exercise his judgment on a case-by-case basis when determining when to average income. There are two additional provisions relevant to Alphson's situation. The IRM says that if the taxpayer "has been unemployed for over one year *and provided proof that Social Security Disability* is the sole source of income * * * [d]o not apply income averaging." Id. pt. 5.8.5.18(5), Example (2) (emphasis

[*22] added). And in situations where the taxpayer's income doesn't meet his stated living expenses, the difference shouldn't automatically be included as additional income, but the officer should ask about the source of unexplained deposits.

Much of the parties' disagreement concerns whether Alphson is really unemployed, and whether he's receiving any additional income. It's clear that the officer didn't simply add as income the difference between Alphson's claimed income and expenses, which would've violated the IRM, but he did note that Alphson somehow made bank deposits of $18,500 each month from entities controlled by family members, plus thousands more from unknown sources. And he also observed that Alphson never substantiated his claims of unemployment, by, for example, showing Social Security checks.

The problem is that since this case was submitted under Rule 122, all we have are exhibits listing dollar amounts with little explanation. The number of these deposits--combined with Alphson's apparent ability to fund an expensive lifestyle without any obvious source of income--might lead one to conclude he wasn't really unemployed or was that receiving income from some other source. But in reviewing a notice of determination, we limit our review to the Commissioner's own explanation. See LG Kendrick, LLC v. Commissioner, 146

[*23] T.C. __, __ (slip op. at 31) (Jan. 21, 2016); <u>Salahuddin v. Commissioner</u>, T.C. Memo. 2012-141. That explanation isn't always clear. The settlement officer stated that she averaged Alphson's income over three years because he was unemployed. This would seem to violate the IRM's direction *not* to average when the taxpayer is unemployed. Moreover, Alphson's AGI from 2008-2010, when he claimed to be unemployed, might not be a good indicator of what he would make when employed in the future. For example, in 2010 most of his reported AGI came from a capital gain related to an entity he appeared to be selling an interest in. In 2009 he reported $172,977 on his Schedule C, but $212,599 of income was a capital gain from selling off his interest in the entity. There is nothing to indicate that Alphson could continue to have such high capital gains in the future-- in fact, his 2011 return showed no income, and while we don't accept this as necessarily accurate, it does call into question whether the hundreds of thousands of dollars in capital gains would continue past 2010. We think then that ascribing $20,404 in monthly income to Alphson to compute his RCP is clear error.

The IRS is on much firmer ground in the settlement officer's analysis of Alphson's $6,355 a month in unexplained deposits. Alphson never explained its source, it was much more recent, and we can't easily ascribe it to a possibly irregular capital gain as with the other amount. We don't think the settlement

[*24] officer abused his discretion when he included this amount in Alphson's future income. As we've already stated, we don't think it was error for the settlement officer to think that at some point Alphson would again find a job (assuming he actually was unemployed), since he was only 51 years old when he made his first offer, had a good education and job experience, and the real-estate market had started to pick up.

The settlement officer made one more error: multiplying Alphson's net monthly income by 120 months to calculate his future income. An older version of the IRM instructs a settlement officer to multiply monthly income by the number of months remaining in the statutory collection period. IRM pt. 5.8.5.6.6 (Sept. 23, 2008). However, this changed in 2010, and the IRM then told settlement officers to multiply monthly income by 60 months or the remaining statutory period, whichever is less, for OICs payable between more than 5 months and 24 months. Id. pt. 5.8.5.23.

Alphson's original offer was for $2,400 to be paid in more than five months, but he didn't specify how long it would take him to pay. He later sent a protest letter about his initial rejection. In this letter Alphson said he'd pay $10,000 (instead of $2,400) and he said he'd pay it over 24 months. Between the two, Alphson expressed his intent to pay the offer in 24 months. That means the

[*25] settlement officer should've multiplied his monthly income by 60 months or the remaining number of months in the collection period, whichever was less. The Commissioner assessed Alphson's 2008 tax on November 23, 2009, and he generally has 10 years from the date of assessment to collect the tax. Sec. 6502. Therefore, even if one ignores any tolling, the Commissioner could've collected the tax until 2019 at the earliest. At the time of the offer in 2011, there was more than 60 months left in the collection period, so the settlement officer should've multiplied the monthly income by 60 months.

This error, though, is completely harmless. For example, if we assigned to Alphson a monthly income of $6,000 (which seems conservative under the circumstances) and allowed $3,000 a month in expenses (rounded up a bit from what the Commissioner allowed), Alphson would have a net monthly income of $3,000. If we multiply that by 60 months, his future income would have been $180,000. Now this is obviously much less than what the settlement officer calculated, but it's also still much, much more than Alphson's offer, and that isn't even considering the $1,195,000 in dissipated assets. As we noted before, even if the settlement officer made errors in calculating Alphson's RCP, we will uphold his decision when the taxpayer's offer is far less than the correct RCP. See Carter v. Commissioner, T.C. Memo. 2007-25.

**[\*26]** Alphson has one more argument. He notes that, while the Commissioner may reject an offer that is significantly less than a taxpayer's OIC, he may accept such an offer when "special circumstances" apply. See id. One of these special circumstances is when a taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the RCP. Regulations provide some examples: a taxpayer who provides full-time care to a dependent child with a serious long-term illness, or a taxpayer who is retired or disabled and living on a fixed income. See sec. 301.7122-1(c)(3)(iii), Proced. & Admin. Regs. Alphson claimed that he would suffer "economic hardship" if he had to pay, but he presented no specific evidence of any such hardship. There's no abuse of discretion in making a determination against a taxpayer on an issue where he produces no evidence. See, e.g., Giamelli v. Commissioner, 129 T.C. at 112.[7]

---

[7] An officer conducting a CDP hearing must always verify that the IRS met the requirements of applicable law and administrative procedures and consider if the collection action balances the need for efficient tax collection with the taxpayer's legitimate concerns. Sec. 6330(c)(3). The settlement officer met both of these requirements.

[*27] Because the settlement officer didn't abuse his discretion in determining to proceed with collection,

<u>Decision will be entered for</u>

<u>respondent</u>.
