# United States Tax Court

T.C. Memo. 2022-4

ESTATE OF ANTHONY K. WASHINGTON, DECEASED,
LENDA WASHINGTON, PERSONAL REPRESENTATIVE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 20410-19L.                    Filed February 2, 2022.

————

*Charles A. Ray, Jr.*, for petitioner.

*Jacob Russin* and *Jeffrey E. Gold*, for respondent.

MEMORANDUM OPINION

TORO, *Judge*: This is a collection due process (CDP) case. The estate of Anthony K. Washington, deceased, Lenda Washington, personal representative (Estate), seeks review pursuant to section 6330(d)(1)[1] of a determination by the Internal Revenue Service (IRS) Independent Office of Appeals (IRS Appeals), dated October 18, 2019, as supplemented on June 17, 2021. That determination, as supplemented, sustained a notice of intent to levy to collect Mr. Washington's unpaid income tax liabilities for the taxable years 2008 to 2010, 2014, and 2015 (Relevant Tax Years) and rejected the Estate's offers-in-compromise. The Commissioner of Internal Revenue has moved for summary judgment under Rule 121, contending that no

———

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (I.R.C. or Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*2] material facts remain in dispute and that IRS Appeals' determination was proper as a matter of law. We agree and will therefore grant the Commissioner's motion.

## *Background*

The following facts are based on the parties' pleadings and motion papers, including the declarations and exhibits attached thereto. *See* Rule 121(b). The facts are stated solely for the purpose of ruling on the Commissioner's motion and not as findings of fact in this case. *See Whistleblower 769-16W v. Commissioner*, 152 T.C. 172, 173 (2019). Ms. Washington resided in Washington, D.C., when the petition in this case was filed.[2]

## I.    *Mr. and Ms. Washington's Marriage and Divorce*

The decedent, Mr. Washington, whose income tax liabilities for the Relevant Tax Years are the subject of this case, married Ms. Washington in 1981. The couple had one son. In 2006, Mr. and Ms. Washington were divorced.

### A.    *The Divorce Decree*

The divorce was finalized by the Superior Court of the District of Columbia, which issued its Findings of Fact, Conclusions of Law and Judgment of Absolute Divorce (Divorce Decree) on June 6, 2006.

---

[2] Our Court has yet to rule on whether the residence of an estate's executor (or personal representative) determines appellate venue under section 7482(b)(1). *See Estate of Clack v. Commissioner*, 106 T.C. 131, 140–41 (1996) (concluding it was unnecessary to decide the question of proper appellate venue for a federal estate tax case); *id.* at 145–49 (Gerber, J., concurring) (concluding that appellate venue depends on domicile of decedent); *id.* at 142 (Chabot, J., concurring in result) (agreeing with Judge Gerber on appellate venue); *id.* at 152, 159–67 (Parker, J., dissenting) (concluding that appellate venue depends on residence of executor of estate). *But see Estate of Thompson v. Commissioner*, 382 F.3d 367, 374 n.12 (3d Cir. 2004) (concluding without significant discussion that residence of executor controls in federal estate tax case), *aff'g* T.C. Memo. 2002-246; *Estate of Israel v. Commissioner*, 159 F.3d 593, 595 (D.C. Cir. 1998) (reaching the same conclusion in federal income tax case), *rev'g and remanding* 108 T.C. 208 (1997). But we need not decide the issue here because we discern no differences that would affect the outcome of this case in the precedent of the U.S. Court of Appeals for the District of Columbia Circuit, where Ms. Washington resided, and that of the U.S. Court of Appeals for the Fourth Circuit, where Mr. Washington apparently was domiciled when he died and where the Estate is being administered. *See Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

**[\*3]**  Two provisions of the Divorce Decree are relevant to this case. The first is the Judgment entered by the court, and the second is a Finding of Fact with respect to a Marital Settlement Agreement (MSA) entered into by the parties as of June 2, 2006.

The Judgment section of the Divorce Decree provided as follows:

### JUDGMENT

WHEREFORE, it is by the Court, this 6th day of June, 2006,

ORDERED, ADJUDGED AND DECREED, that the Plaintiff, Lenda P. Washington, be and hereby is, awarded an absolute divorce from the Defendant, Anthony Washington, on the ground that the parties have lived separate and apart, without cohabitation and without interruption, for at least one year next preceding the filing of the Complaint for Absolute Divorce.

PROVIDED, HOWEVER, that pursuant to D.C. Code Section 16-920 (Suppl., 2004) this Judgment shall become effective to dissolve the bonds of matrimony thirty (30) days after the docketing of this Judgment unless either party applies for a Stay with the Superior Court or the Court of Appeals of the District of Columbia, and

FURTHER PROVIDED, that the Court reserves jurisdiction for the entry of the appropriate retirement order.[3]

Paragraph 7 of the Findings of Fact of the Divorce Decree explained:

The parties entered into a comprehensive Marital Settlement Agreement dated June 2, 2006 . . . , which resolved all issues between the parties. There are no issues remaining to be resolved by the Court, other than the granting of the divorce and entry of the Order with respect to Defendant's retirement plan.

---

[3] At a remote hearing on November 16, 2021, the Estate represented that, to its knowledge, the superior court did not enter such an order.

[*4]   B.   *The MSA*

The MSA, in turn, stated that the parties had separated and lived apart since on or about January 12, 2002, and,

> In view of the separation, the parties . . . [were] desirous of settling and determining their obligations to each other and all of their property rights; the custody and support of their son, the maintenance and support of each of the parties by the other; as well as all other rights, claims, relationships or obligations between them arising out of [Mr. and Ms. Washington's] marriage or otherwise.

Three provisions of the MSA are particularly relevant to this case. They relate to (1) Mr. and Ms. Washington's retirement plans, (2) a life insurance policy provided to Mr. Washington through his employer, and (3) Mr. and Ms. Washington's intentions concerning the interaction of the MSA and the Divorce Decree.

### 1.   *Provision Regarding Retirement Plans*

With respect to the retirement plans, section 4.6(c) of the MSA provided:

> <u>Waiver of Pension and Retirement Rights</u>.   Except as otherwise set forth herein, each party hereby expressly waives any legal right he or she may have under any federal or state law as a spouse or former spouse, or person with an insurable interest, or otherwise, to participate as a "spouse" or "former spouse" or payee or alternate payee or beneficiary or otherwise under the other party's pension, profit sharing, retirement, . . . 401(k), . . . or other similar plans, programs or accounts, including, but not limited to, the right to receive any benefit whether in the form of a lump sum distribution or a lump sum death benefit, or a single and/or joint and/or joint and survivor annuity, or a pre-retirement survivor annuity, or a survivor annuity, or otherwise. . . . Each party agrees to execute all documents necessary to implement the provisions of this paragraph.

> In an effort to comply with the intent of this article; (i) if a party is unable for any reason to change the beneficiary or the death benefits of his or her pension, profit sharing, or other form of retirement or deferred income plan, or any

[*5] other plan referred to in the paragraph above, or (ii) if a party files an election subsequent to the date of execution of this Agreement but such election is for any reason ineffective and the benefits are, in fact, paid to the surviving party contrary to the intention of this paragraph, or, (iii) if a party fails to designate a beneficiary and the plan provides for payment to the "spouse" or "former spouse," then in any of such events the surviving party shall, and except as otherwise provided in this Agreement, at the direction of and at the sole discretion of the decedent's personal representative, either: (A) disclaim any entitlement to any benefits received or receivable; or (B) assign all rights to receive such benefits to the estate of the deceased party or the person designated by the decedent or the decedent's personal representative to receive such benefits; or (C) pay the . . . [net] after-tax benefits over to the estate of the deceased party or to the person designated by the decedent or by the decedent's personal representative.

### 2. *Provision Regarding Life Insurance*

With respect to the life insurance policy, section 5.0 and 5.1 of the MSA provided:

**LIFE INSURANCE**

The parties' son is currently named as the beneficiary of the Husband's life insurance through his employment with a face amount of $100,000.[4] The Husband agrees to irrevocably elect the Wife as the beneficiary of this coverage on his life for so long as he is employed, and further agrees not to borrow against or otherwise encumber such life insurance proceeds. The Husband agrees that his notarized signature on page 12[5] of this Agreement constitutes his irrevocable designation of the Wife as such beneficiary, and directs Radio One, upon receipt of a copy of this paragraph and the signature page,

---

[4] At the November 16, 2021, remote hearing, the Estate did not dispute that the life insurance proceeds were in fact paid to Mr. and Ms. Washington's son upon Mr. Washington's death.

[5] The signatures appear on page 13 (not page 12) of the MSA.

**[\*6]**   . . . to effectuate the intent of this paragraph by so listing the Wife as the irrevocable beneficiary.

3.    *Provision Regarding Interaction with Divorce Decree*

Finally, with respect to the interaction of the MSA and the Divorce Decree, section 11.0 and 11.1 of the MSA provided:

**MERGER OF AGREEMENT IN DECREE OF DIVORCE**

The parties shall be bound by all the terms of this Agreement in resolving the pending divorce case . . . between them in the District of Columbia. The parties further agree that this Agreement shall be independent of and shall not be merged in or otherwise affected thereby.

II.    *The Estate's Tax Liabilities and IRS Collection Efforts*

A.    *Federal Income Tax Returns for 2008, 2009, and 2010 and Mr. Washington's Death*

Mr. Washington had substantial earnings in 2008, 2009, and 2010, but did not file timely federal income tax returns for those years. The IRS inquired about Mr. Washington's failure to file timely returns and eventually received his late-filed returns in 2014. Although the returns showed that income tax was due for each year, Mr. Washington did not pay the outstanding balances shown on the returns. The IRS assessed the tax shown on the returns together with certain additions to tax and penalties. The IRS also entered into an installment agreement with Mr. Washington permitting him to pay the outstanding balances for these years over time.

Unfortunately, on November 10, 2015, about a year after entering into the installment agreement, Mr. Washington died intestate, terminating the installment agreement, and leaving a significant portion of his federal tax liabilities for 2008, 2009, and 2010 unpaid.

Just over two years later, on December 22, 2017, the IRS recorded a lien with respect to the outstanding liabilities for these years. The IRS timely notified the Estate of the lien filing and of the right to a CDP hearing, but the Estate did not seek a hearing.

**[\*7]** B. *Federal Income Tax Returns for 2014 and 2015*

Mr. Washington also had substantial earnings in 2014 and 2015. He failed to file a timely return for 2014, and the Estate failed to file a timely return for 2015. In 2017, Ms. Washington, as personal representative of the Estate, caused the Estate to file Mr. Washington's income tax returns for 2014 and 2015, but it did not pay the outstanding balances shown on those returns. As with the prior years, the IRS assessed the tax shown on the returns for 2014 and 2015, together with certain additions to tax and penalties.

C. *Additional IRS Collection Efforts*

In an effort to collect Mr. Washington's unpaid tax, on March 30, 2018, the IRS mailed to the Estate a Notice LT11, Notice of Intent to Levy and Notice of Your Right to a Hearing. The notice advised that the IRS intended to seize the Estate's property or rights to property to collect the outstanding balance for the Relevant Tax Years and informed the Estate of the right to request a CDP hearing. The notice showed an overall balance due of $189,593 before certain penalties and interest.

On April 9, 2018, the IRS timely received from the Estate a Form 12153, Request for a Collection Due Process or Equivalent Hearing. The request listed the Relevant Tax Years as the periods at issue and checked the appropriate box to request a hearing regarding a "Proposed Levy or Actual Levy." The request was referred to IRS Appeals.

III. *CDP Proceedings and the Estate's Initial Offer-in-Compromise*

The Estate's CDP case was assigned to Settlement Officer Darlene J. Macaulay. The Estate submitted a Form 656, Offer In Compromise, accompanied by a Form 433-A (OIC), Collection Information Statement for Wage Earners and Self-Employed Individuals. The Form 433-A (OIC) and bank statements attached to it indicated that the Estate owned a Bank of America account with a value of $34,570. The Estate offered $10,000 to settle the tax liability for the Relevant Tax Years. The Estate stated that the basis for its offer was "Doubt as to Collectibility—I do not have enough assets and income to pay the full amount." The "Explanation of Circumstances" section of the Form 656 was left blank.

After some initial communications with the Estate, Settlement Officer Macaulay referred the case to the IRS Centralized Offer in

[*8] Compromise (COIC) unit. Following communications from the COIC unit, the Estate provided additional documentation to assist in the evaluation of its offer-in-compromise. Ultimately, the COIC unit notified the Estate that it had reached a preliminary decision to reject the Estate's $10,000 offer because it calculated the Estate's reasonable collection potential as far exceeding its offer. The determination was largely based on the balance of Mr. Washington's section 401(k) account at the time of his death (approximately $148,000) and the fact that the allowable expenses determined by the COIC unit (that is, the expenses with priority over the federal tax liability) did not reduce the reasonable collection potential to the amount the Estate offered. The case was returned to Settlement Officer Macauley.

After further communication between the Estate's counsel and Settlement Officer Macaulay, the Estate's CDP case was transferred from Settlement Officer Macaulay to Settlement Officer Steven A. Lerner. On October 2, 2019, Settlement Officer Lerner held the Estate's CDP hearing. The Estate offered arguments in support of its position but declined to increase its offer.

Shortly thereafter, Settlement Officer Lerner issued a notice of determination sustaining the notice of intent to levy and the rejection of the Estate's offer. Settlement Officer Lerner noted that the Estate had not challenged either the amount or the existence of the underlying tax liability, and that the Estate's counsel had proposed no collection alternatives except for the $10,000 offer. Like the COIC unit, Settlement Officer Lerner relied on the large balance of the section 401(k) account at the time of Mr. Washington's death and the expenses he thought allowable, and found the Estate's offer inadequate.

IV.  *Tax Court Proceedings and Remand to IRS Appeals*

On November 15, 2019, the Estate timely petitioned our Court for review of IRS Appeals' determination. In its petition, the Estate alleged that the $10,000 offer was erroneously rejected because, in its view, the disbursements that IRS Appeals considered nonpriority expenses in fact had priority over the Estate's unpaid federal tax liability. The Estate also cited "other reasons" that were not specified.

A.  *The Commissioner's First Motion for Summary Judgment and the Estate's Revised Offer-in-Compromise*

On November 19, 2020, the Commissioner moved for summary judgment. The Estate opposed the motion. In its opposition the Estate

**[*9]** argued, among other things, that IRS Appeals had overstated the Estate's reasonable collection potential by double-counting the balance of the section 401(k) account. Discussions between the parties ensued.

On February 25, 2021, the Estate sent a letter to the Commissioner's counsel referencing a conference call in which the parties had discussed remanding the case to IRS Appeals for further consideration if the Estate would provide additional information regarding its offer. Attached to that letter was, as the Estate put it, a "resubmi[ssion]" of the Estate's offer, including revised Forms 433-A (OIC) and 656 and certain additional documentation.

The Estate's revised Form 433-A (OIC) indicated that the Estate's assets consisted of a Bank of America account with a value of $24,990. The Estate increased its offer-in-compromise amount from $10,000 to $23,990, reflecting the value of the bank account less $1,000. As in the initial Form 656, the Estate indicated the reason for the offer was "Doubt as to Collectibility—I do not have enough assets and income to pay the full amount." But, unlike the initial form, the revised form also stated in the "Explanation of Circumstances" section: "Doubt as to Collectibility with Special Circumstances / Statement of Special Circumstances with Exhibits Follows This Page."

Attached to the Estate's Form 656 was a "Supplemental Statement of Special Circumstances" that purported to show why the Estate's $23,990 offer should be accepted. In general, the Supplemental Statement of Special Circumstances asserted that there were claims and expenses of $230,768 having priority over the Estate's unpaid federal tax liability, including an "Unsatisfied Judgment debt" of $100,000 the Estate owed to Ms. Washington. The Supplemental Statement of Special Circumstances stated that because the amount of priority claims (i.e., $230,768) exceeded the total assets of the Estate available for distribution (i.e., $203,802), the $23,990 offer was reasonable.

To support the position set forth in the Supplemental Statement of Special Circumstances, the Estate provided an informal accounting of its expenses, copies of the supplemental information originally provided to Settlement Officer Macaulay, a copy of the Divorce Decree, excerpts from the MSA, and other supporting materials.

B.     *Remand to IRS Appeals*

The Commissioner's counsel forwarded to IRS Appeals the Estate's revised Forms 433-A (OIC) and 656, including the

[*10] Supplemental Statement of Special Circumstances and other supporting documentation.

The Commissioner then moved the Court to remand the Estate's case to IRS Appeals for a supplemental administrative hearing for the purpose of reviewing the additional information and potentially negotiating an offer-in-compromise. The Court issued an order granting the Commissioner's motion and remanding the case to IRS Appeals on March 18, 2021.

C.     *Supplemental Determination on Remand and the Commissioner's New Motion for Summary Judgment*

On remand, the Estate's case was assigned to Appeals Officer Charles E. Duff. Appeals Officer Duff held a hearing with the Estate's counsel on March 31, 2021. After reviewing the supplemental materials forwarded to IRS Appeals, Appeals Officer Duff determined that the beginning value of the Estate was $212,267.[6] He also determined that only a portion of the Estate's expenses ($91,355) was valid and senior to its unpaid federal tax liability.[7] These two determinations resulted in a reasonable collection potential of $120,912. Appeals Officer Duff noted that he would not decrease the Estate's reasonable collection potential by the value of the purported judgment debt and also declined to deduct from the Estate's reasonable collection potential several other smaller expenses that the Estate argued were senior to the unpaid tax liability.

The Estate provided Appeals Officer Duff with additional documentation after the March 31 hearing, including informal estate

---

[6] While the Estate claimed that the beginning value should be $203,802, Appeals Officer Duff calculated the value by adding the following amounts: 2017 proceeds from a Fidelity section 401(k) account of $154,156; a Bank of America account balance of $56,629; veterans' benefits, Social Security benefits, and employer vacation pay of $5,489; and 2016 distributions from a Fidelity account of $7,722. Appeals Officer Duff then reduced the sum of those amounts ($223,996) by "allowed debits and checks" of $11,729. These allowed debits and checks included, among other things, approximately $9,000 in ATM cash withdrawals after Mr. Washington's death, $1,000 in checks drawn on the Estate's account after Mr. Washington's death, and an overdraft fee.

[7] These expenses consisted of the following: federal estate tax of $45,123; Maryland estate tax of $10,668; a tax preparation fee of $1,500; "state allowed costs" of $17,306; and burial, cleaning, moving, rent, and parking expenses of $16,128. We note that the sum of these amounts is $90,725, rather than $91,355, but a transposition error appears to have led Appeals Officer Duff to use the latter number, to the Estate's benefit.

[*11] accountings, bank statements, and other records. On April 29, 2021, the Estate's counsel faxed to Appeals Officer Duff explanations of the Estate's arguments regarding special circumstances warranting acceptance of the Estate's offer-in-compromise. The special circumstances consisted of the purported $100,000 debt to Ms. Washington (which the Estate argued was supported by a judgment lien) and the Estate's payment of a loan on an automobile that was transferred to Mr. and Ms. Washington's son after Mr. Washington's death. Appeals Officer Duff continued the hearing in a separate conference on May 10, in which he and counsel for the Estate discussed the arguments presented in the April 29 facsimile. Appeals Officer Duff determined that those arguments did not support finding "special circumstances" that would warrant acceptance of the Estate's offer-in-compromise.

On June 17, 2021, Appeals Officer Duff issued a supplemental notice of determination rejecting the Estate's $23,990 offer and sustaining the notice of intent to levy. In the supplemental notice, Appeals Officer Duff found that (1) the requirements of any applicable law or administrative procedure were met and that IRS records confirmed the proper issuance of the notice and demand, notice of intent to levy, and notice of a right to a CDP hearing; (2) an assessment was properly made for each tax and period listed on the CDP notice and that notice and demand for payment was mailed to the Estate's last known address; (3) there was a balance due when the notice of intent to levy was issued; (4) Appeals Officer Duff had no prior involvement with respect to the Relevant Tax Years; and (5) the IRS followed all legal and procedural requirements, and the actions taken or proposed were appropriate under the circumstances.

Following the issuance of the supplemental notice, we denied the Commissioner's first motion for summary judgment without prejudice to his right to renew the motion based on the supplemental notice.

On September 9, 2021, the Commissioner filed the motion for summary judgment now before us. The Estate filed a response opposing the motion (Opposition), and the Commissioner filed a reply. We held a remote hearing on the Commissioner's motion on November 16, 2021, at which both parties appeared and were heard.

We turn now to discussing the merits of the Commissioner's motion.

**[\*12]**                    *Discussion*

I.    *Summary Judgment*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party (here, the Estate). *Sundstrand Corp.*, 98 T.C. at 520.

The Estate argued in its Opposition that material facts remain in dispute in this case. At the hearing, however, both parties agreed that all remaining disputes are with respect to questions of law rather than questions of fact. Accordingly, the parties agree that we may properly resolve this case through summary adjudication.

II.   *CDP Issues*

A.    *The CDP Process*

Pursuant to section 6321, the Federal Government obtains a lien against "all property and rights to property, whether real or personal" of any person liable for federal tax upon demand for payment and failure to pay. *See Iannone v. Commissioner*, 122 T.C. 287, 293 (2004). The lien arises when tax is assessed. *See* I.R.C. § 6322.

The Code also authorizes the IRS to levy on (i.e., to seize) property or property rights of any person who is liable for any tax and has failed to pay that tax after proper notice and demand. I.R.C. §§ 6331, 7701(a)(11)(B), (12)(A)(i); *see also Ramey v. Commissioner*, 156 T.C. 1, 2–3 (2021). Because the power to levy is a strong remedy for collecting unpaid tax, the Code, in section 6330, gives taxpayers the right to a hearing with IRS Appeals (a CDP hearing). I.R.C. § 6330(b)(1); *Ramey*, 156 T.C. at 2.

At the CDP hearing, IRS Appeals must verify that the requirements of any applicable law or administrative procedure have been met. I.R.C. § 6330(c)(1). Additionally, IRS Appeals generally must consider any issues raised by the taxpayer. I.R.C. § 6330(c)(3)(B). This

**[\*13]** includes offers of collection alternatives, such as offers-in-compromise. I.R.C. § 6330(c)(2)(A)(iii). Finally, IRS Appeals must consider "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person [involved] that any collection action be no more intrusive than necessary." I.R.C. § 6330(c)(3)(C). *See generally Byers v. Commissioner*, 740 F.3d 668, 672 (D.C. Cir. 2014), *aff'g* T.C. Memo. 2012-27; *Moosally v. Commissioner*, 142 T.C. 183, 187 (2014); *Weber v. Commissioner*, 138 T.C. 348, 354 (2012).

B. *Offers-in-Compromise*

In general terms, an offer-in-compromise is an agreement between the Government and a taxpayer to settle a tax liability for less than the full amount owed. *See* I.R.C. § 7122(a); Treas. Reg. § 301.7122-1(a); Internal Revenue Manual (IRM) 8.23.1.1.1(1) (Aug. 23, 2021).[8] Offers-in-compromise are authorized by section 7122(a), which provides that the Secretary may compromise any civil or criminal case arising under the internal revenue laws. The decision whether to accept or reject an offer-in-compromise is left to the Secretary's discretion. *Fargo v. Commissioner*, 447 F.3d 706, 712 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-13; *see also* Treas. Reg. § 301.7122-1(c)(1).

The Secretary may accept an offer-in-compromise on three grounds: (1) doubt as to liability, (2) doubt as to collectibility, and (3) the promotion of effective tax administration. *See* Treas. Reg. § 301.7122-1(b). Doubt as to liability is not at issue in this case.

1. *Doubt as to Collectibility*

The Secretary may accept an offer-in-compromise on a "doubt as to collectibility" basis when the taxpayer's assets and income render full collection unlikely. *Id.* subpara. (2). Conversely, the Secretary may reject an offer-in-compromise when the taxpayer's reasonable collection potential exceeds the amount it proposed to pay. *See Johnson v.*

---

[8] The provisions of the IRM can be instructive in understanding the IRS's interpretation of a statute, *see Ginsburg v. Commissioner*, 127 T.C. 75, 87 (2006), and in ascertaining the procedures the IRS expects its employees to follow, *see Wadleigh v. Commissioner*, 134 T.C. 280, 294 (2010). The IRM does not, however, have the force of law. *See Marks v. Commissioner*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991), *aff'g* T.C. Memo. 1989-575; *Vallone v. Commissioner*, 88 T.C. 794, 807 (1987).

**[\*14]** *Commissioner*, 136 T.C. 475, 486 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013).

In general, any offer substantially below the taxpayer's reasonable collection potential is rejected unless special circumstances justify acceptance of the offer. *See Gustashaw v. Commissioner*, T.C. Memo. 2018-215, at \*15–16; *Mack v. Commissioner*, T.C. Memo. 2018-54, at \*10; Rev. Proc. 2003-71, § 4.02(2), 2003-2 C.B. 517, 517. Special circumstances include:

> (1) circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the reasonable collection potential of the case or (2) if no demonstration of such suffering can be made, circumstances justifying acceptance of an amount less than the reasonable collection potential of the case based on public policy or equity considerations.

*Murphy v. Commissioner*, 125 T.C. 301, 309 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006); *see also* IRM 5.8.4.2 (May 10, 2013). Compelling public policy or equity considerations exist when, because of exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner. *See* Treas. Reg. § 301.7122-1(b)(3)(ii); *see also Murphy*, 125 T.C. at 309; IRM 5.8.4.2(4).

## 2. *Promotion of Effective Tax Administration*

When a taxpayer's reasonable collection potential exceeds the taxpayer's liability—i.e., when the Secretary determines that the taxpayer is able to pay the liability in full—doubt as to collectibility is not a ground for compromise. But the Secretary may still enter into a compromise on effective tax administration grounds if (1) collection of the full liability would cause the taxpayer economic hardship or (2) exceptional circumstances exist so that collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner. Treas. Reg. § 301.7122-1(b)(3)(i) and (ii). No compromise is permitted for effective tax administration reasons if compromise of the liability would undermine compliance by taxpayers with the tax laws. *Id.* subdiv. (iii).

**[\*15]**     3.     *Offers-in-Compromise and IRS Appeals Procedures*

When an offer-in-compromise is made at a CDP hearing, IRS Appeals generally forwards the offer to the COIC unit, which investigates the offer and either accepts it or recommends that IRS Appeals reject it. *See* IRM 8.22.7.10.1.1(1) and (2) (Aug. 26, 2020). If the COIC unit recommends rejection, IRS Appeals reconsiders disputed items. *Id.* 8.22.7.10.1.1(3).

In certain circumstances, an IRS Appeals officer evaluating an offer-in-compromise may request assistance from a specialized unit. *See id.* 8.22.7.4.2(1) and (2), 8.23.3.3.1.3 and .4 (Aug. 18, 2017). But even in those cases, IRS Appeals retains jurisdiction over the offer-in-compromise and its disposition. *See id.* 8.22.7.10.1.1(3), 8.23.3.3.1.4(7)–(9).

C.     *Standard of Review*

Section 6330(d)(1) does not prescribe the standard of review that this Court should apply in reviewing an IRS administrative determination in a CDP case. The framework for that review is set out in our cases.

When the validity of the underlying tax liability is properly at issue in a collection review proceeding, the Court will review the matter de novo. *Giamelli v. Commissioner*, 129 T.C. 107, 111 (2007); *Davis v. Commissioner*, 115 T.C. 35, 39 (2000). When (as here) the underlying liability is not properly before us, we review the determination for abuse of discretion. *Byers v. Commissioner*, 740 F.3d at 675 (citing *Tucker v. Commissioner*, 676 F.3d 1129, 1135–37 (D.C. Cir. 2012), *aff'g* 135 T.C. 114 (2010) *and* T.C. Memo. 2011-67); *Giamelli*, 129 T.C. at 111; *Sego v. Commissioner*, 114 T.C. 604, 610 (2000); *Goza v. Commissioner*, 114 T.C. 176, 182 (2000). That is, we do not substitute our own judgment for that of IRS Appeals and do not decide de novo whether we would have reached the same determination as IRS Appeals. Rather, we decide whether IRS Appeals' determination was arbitrary, capricious, or without sound basis in fact or law. *Murphy*, 125 T.C. at 320.

**[\*16]** Because the underlying tax liability is not at issue in this case, we review Appeals Officer Duff's supplemental determination for abuse of discretion.[9]

### III.   *Application of CDP Principles to the Estate's Case*

The Commissioner argues that Appeals Officer Duff was correct when he rejected the Estate's offers-in-compromise and sustained the notice of intent to levy.  The Estate argues that Appeals Officer Duff's determination was an abuse of discretion.  For the reasons described below, we agree with the Commissioner.  We address each of the Estate's arguments in turn.

#### A.   *Failure to Satisfy Verification Requirements*

The Estate first claims that Appeals Officer Duff abused his discretion by failing to satisfy the verification requirements of section 6330(c)(1).  That provision states that "[t]he appeals officer shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met."  I.R.C. § 6330(c)(1).

The Estate argues that Appeals Officer Duff failed to satisfy this requirement because provisions of the IRM required that the Estate's offers-in-compromise be forwarded to a specialized unit in Austin, Texas (Austin Office), for consideration.[10]  In the Estate's view, Appeals Officer Duff's (and the other Appeals officers') failure to forward the Estate's offers to the Austin Office constituted an abuse of discretion. We disagree.

The IRM provisions the Estate cites establish that the Austin Office considers only offers-in-compromise based on effective tax

---

[9] As the Estate recognizes in its Opposition, when this Court remands a case to IRS Appeals, we review the position taken in the last supplemental determination instead of any prior notices.  *See Kelby v. Commissioner*, 130 T.C. 79, 86 (2008). Accordingly, we focus here on Appeals Officer Duff's determination.

[10] In 2002, the IRS established the Austin Office "[i]n order to develop consistency in the interpretation and application" of the rules regarding offers-in-compromise submitted on an "Effective Tax Administration" basis.  *See* IRM 5.8.11.5.1(2) (Oct. 4, 2019); *see also* T.D. 9007, 2002-2 C.B. 349.  *See generally* Treas. Reg. § 301.7122-1.

**[\*17]** administration. *See, e.g.*, IRM 5.8.11.3.2(1) (Aug. 5, 2015), 5.8.11.5.1.[11] Moreover, the Austin Office investigates only a specific subset of effective tax administration offers referred to as "non-economic hardship effective tax administration" offers. These are effective tax administration cases in which the taxpayer's liability could be collected in full without economic hardship, but the taxpayer can nonetheless demonstrate that a compelling public policy or equity issue provides a sufficient basis for compromise.[12] *See id.* 5.8.11.3.2(1) and (2); *see also id.* 8.23.3.4.1(2), Ex. 8 (noting that IRS Appeals should contact the Austin Office if "the taxpayer raises issues involving [Effective Tax Administration] Public Policy").

Neither of the Estate's offers qualified for consideration as an offer-in-compromise based on effective tax administration. Such consideration is available only when the taxpayer is able to pay the balance in full. *Murphy*, 125 T.C. at 320 (Treasury Regulation § 301.7122-1(b)(3)(ii) "makes the ability to make full payment a precondition to any offer in compromise based on effective tax administration."); *see also* IRM 5.8.11.5(2) (Oct. 4, 2019) ("[U]nless [the taxpayer] ha[s] the ability to full[y] pay the liability, the offer would not meet the legal standard for [effective tax administration] consideration."). Here, Appeals Officer Duff determined that the Estate could not pay the outstanding liability in full. And the Estate conceded as much at the hearing. Accordingly, under the regulations and the IRM provisions on which the Estate relies, the Estate's offer did not qualify for effective tax administration consideration and referral to the Austin Office would not have been appropriate.[13]

---

[11] For example, IRM 5.8.11.5.1(3) states:

Only after consideration has been given to all other potential bases for acceptance (e.g. [Doubt as to Liability, Doubt as to Collectibility, Doubt as to Collectibility with Special Circumstances], and/or [Effective Tax Administration] based on economic hardship) will [Effective Tax Administration]-Public Policy/Equity be considered. Therefore, all cases must have been completely developed under all other bases before transfer will be accepted by the Austin Group . . . ."

[12] These "non-economic hardship" effective tax administration offers are sometimes referred to in the IRM as "NEH-ETA" offers, *see, e.g.*, IRM 5.8.11.3.2(1), or "ETA Public Policy" or "ETA Public Policy/Equity" offers, *see, e.g.*, *id.* 5.8.1.15.5(2) (Apr. 20, 2021), 5.8.11.3.2.1(4) (Oct. 4, 2019), 8.23.3.4.1(1) (Aug. 18, 2017).

[13] In reaching this conclusion, we assume, solely for the sake of argument, that the IRM provisions the Estate cites apply to IRS Appeals Officers and not just to

**[*18]** B.    *Rejection of Offers-in-Compromise Based on Allegedly Erroneous Reasonable Collection Potential Calculations*

The Estate's remaining arguments boil down to a claim that Appeals Officer Duff abused his discretion in rejecting the Estate's revised offer-in-compromise because he miscalculated the Estate's reasonable collection potential.  We address these arguments below.

1.    *Ms. Washington's Status as a Judgment Lien Creditor*

The Estate's primary argument on this score hinges on whether Appeals Officer Duff made an error of law in refusing to recognize Ms. Washington as a judgment lien creditor of the Estate.  Judgment lien creditors who obtain their judgments before a notice of federal tax lien is properly filed and meet certain other requirements take priority over the United States.  *See* I.R.C. § 6323(a); Treas. Reg. § 301.6323(h)-1(g).  Accordingly, a taxpayer's reasonable collection potential is reduced by amounts owed to such judgment lien creditors.  *See* IRM 5.8.4.3.1(1) (Apr. 30, 2015), 5.8.5.4.1(1) (Sept. 30, 2013).  As we explain below, however, we see no error in Appeals Officer Duff's determination.

Whether an individual is a judgment lien creditor with priority over a federal tax lien is a question of federal law.  *See In re Charco, Inc.*, 432 F.3d 300, 304 (4th Cir. 2005) (citing *Aquilino v. United States*, 363 U.S. 509, 514 (1960)).  *See generally United States v. McDermott*, 507 U.S. 447, 449–50 (1993).  As relevant here, under the terms of the applicable regulation, to be a "judgment lien creditor" a person (1) must have a valid judgment, (2) from a court of record and competent

---

collection personnel, as the Commissioner contends.  Moreover, in light of our conclusion, we need not address whether section 6330(c)(1) in fact requires an IRS Appeals officer to verify that the officer's own actions at a CDP hearing (as opposed to actions undertaken by IRS personnel outside of IRS Appeals before the hearing) comply with the "requirements of any applicable law or administrative procedure." But consider section 6330(c)(1) (requiring that an IRS Appeals officer obtain verification "from the Secretary," not from IRS Appeals) and Treasury Regulation § 301.6330-1(e)(1) ("Prior to issuance of a determination, Appeals is required to obtain verification *from the IRS office collecting the tax* that the requirements of any applicable law or administrative procedure with respect to the proposed levy have been met." (emphasis added)).

**[\*19]** jurisdiction, (3) for the recovery of specifically designated property or a certain sum of money. *See* Treas. Reg. § 301.6323(h)-1(g).[14]

There is no dispute here that the Divorce Decree contains a valid Judgment and that the Superior Court of the District of Columbia is a court of record that had jurisdiction to enter the Judgment. But the parties dispute whether the Judgment provides for Ms. Washington to recover specifically designated property or a certain sum of money. The Estate maintains that it does. We conclude that the Estate's position lacks merit.

### a. *Text of the Judgment*

To begin with, the Judgment states simply that Ms. Washington is awarded a divorce and that the superior court retains jurisdiction for the entry of an appropriate retirement order. The Judgment does not refer to any specific property or sum of money owed to Ms. Washington. Nor does it incorporate by reference any other document addressing such rights. In short, the Judgment on its face offers no support for the Estate's argument that Ms. Washington is a judgment lien creditor. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 150–51 (2009) (stating that a court should enforce a court order "according to its unambiguous terms").

Despite the Judgment's silence with respect to any property rights or any monetary award for Ms. Washington, the Estate argues that the Judgment is ambiguous and that arrangements outside the four

---

[14] Treasury Regulation § 301.6323(h)-1(g) further provides, in relevant part:

In the case of a judgment for the recovery of a certain sum of money, a judgment lien creditor is a person who has perfected a lien under the judgment on the property involved. A judgment lien is not perfected until the identity of the lienor, the property subject to the lien, and the amount of the lien are established. Accordingly, a judgment lien does not include an attachment or garnishment lien until the lien has ripened into judgment, even though under local law the lien of the judgment relates back to an earlier date. If recording or docketing is necessary under local law before a judgment becomes effective against third parties acquiring liens on real property, a judgment lien under such local law is not perfected with respect to real property until the time of such recordation or docketing. If under local law levy or seizure is necessary before a judgment lien becomes effective against third parties acquiring liens on personal property, then a judgment lien under such local law is not perfected until levy or seizure of the personal property involved. . . .

**[*20]** corners of a divorce judgment can sometimes be made part of the judgment through the doctrines of merger[15] and incorporation.[16] In particular, the Estate contends that Ms. Washington obtained a judgment lien for $100,000—the amount of life insurance proceeds to which, according to the Estate, Ms. Washington was entitled under the MSA—because the MSA was incorporated into the Divorce Decree.

The Estate's arguments raise significant threshold questions, including (1) whether the text of the Judgment is unambiguous and therefore forecloses reliance on documents outside the Judgment, and (2) if the text of the Judgment is ambiguous (thereby permitting review of the record of the divorce proceedings and the MSA), whether the prerequisites for incorporation have in fact been satisfied. But we need not resolve these questions here, because even assuming they should be resolved in favor of the Estate, the Estate still would not prevail.

b. *Lack of Substantive Support for the Estate's Position*

As already noted, Ms. Washington's claim rests on section 5.1 of the MSA, addressing life insurance. That section states:

> The parties' son is currently named as the beneficiary of the Husband's life insurance through his employment with a face amount of $100,000. The Husband agrees to irrevocably elect the Wife as the beneficiary of this coverage on his life for so long as he is employed, and further agrees not to borrow against or otherwise encumber such life insurance proceeds. The Husband

---

[15] Although approaches vary among jurisdictions, an outside agreement may be merged into the divorce judgment. When that happens, the agreement typically is extinguished, and the rights and obligations of the parties are governed exclusively by the divorce decree. *See, e.g.*, Doris Del Tosto Brogan, *Divorce Settlement Agreements: The Problem of Merger or Incorporation and the Status of the Agreement in Relation to the Decree*, 67 Neb. L. Rev. 235, 245 (1988). As a result, the terms of an agreement merged into a divorce decree generally may be enforced through contempt proceedings (and modified by the court), but do not provide the parties with a cause of action based on contractual rights. *See id.* at 244; *Duffy v. Duffy*, 881 A.2d 630, 638–39 (D.C. 2005).

[16] By contrast to merger, an agreement that is incorporated (but not merged) into a divorce decree typically survives as a separate agreement and is rendered res judicata for purposes of any subsequent action. *See* Brogan, *supra*, at 247. Such agreements generally are less easily modified by the court, *see, e.g.*, *Blount v. Padgett*, 261 A.3d 200, 205 n.8 (D.C. 2021); *Duffy*, 881 A.2d at 640, but often can be enforced directly by the parties in a breach of contract action, *see* Brogan, *supra*, at 245.

**[\*21]** agrees that his notarized signature on page [13] of this Agreement constitutes his irrevocable designation of the Wife as such beneficiary, and directs Radio One [Mr. Washington's employer], upon receipt of a copy of this paragraph and the signature page, . . . to effectuate the intent of this paragraph by so listing the Wife as the irrevocable beneficiary.

For the Estate to prevail, the Divorce Decree must have provided a judgment either (1) "for the recovery of specifically designated property" or (2) "for a certain sum of money." *See* Treas. Reg. § 301.6323(h)-1(g). It is not altogether clear on which of these two alternatives the Estate relies, but it is clear that neither one produces the Estate's desired result.

i.        *"Specifically Designated Property"*

Take the first alternative. If the Estate's argument is that the Divorce Decree represents a judgment "for the recovery of specifically designated property" in the form of the life insurance policy, then Appeals Officer Duff's analysis did not affect Ms. Washington's purported interest. Appeals Officer Duff did not include the proceeds of the life insurance policy in the reasonable collection potential computation. Therefore, even if Ms. Washington had obtained a judgment lien with respect to that "specifically designated property" (that is, the life insurance policy), it would have been irrelevant to Appeals Officer Duff's analysis, and he could not have committed any error adverse to the Estate with respect to it. Put another way, even if we were to agree with the Estate that the Divorce Decree gave Ms. Washington a priority claim with respect to the life insurance policy (a proposition on which we express no view), Appeals Officer Duff's determination left that claim untouched because he disregarded the life insurance policy as an asset of the Estate when determining the Estate's reasonable collection potential. Put yet another way, with respect to the life insurance policy, Appeals Officer Duff's reasonable collection potential computations in effect treated Ms. Washington's interest as having priority over the United States' claim.

ii.        *"Certain Sum of Money"*

Turn next to the second alternative. If the Estate's argument is that the Divorce Decree represents a judgment "for a certain sum of money," the argument fails for at least three reasons.

**[\*22]** First, the text of section 5.1 of the MSA makes plain that Ms. Washington's opportunity to obtain $100,000 was entirely contingent, not a judgment for a certain sum of money collectible immediately. *See, e.g.*, *Don King Prods., Inc. v. Thomas*, 945 F.2d 529, 534 (2d Cir. 1991) ("[T]he assignment of a right to receive income contingent upon the occurrence of a future event . . . does not convey a present interest to the assignee."); *Carrillo v. Coors*, 901 P.2d 214, 217 (N.M. Ct. App. 1995) (surveying the applicable law and concluding that, absent a contrary statutory provision, "financial obligations in a divorce decree do not give rise to a judgment lien unless they are for a fixed sum which is collectible immediately"). For Ms. Washington to be entitled to recover under the policy, Mr. Washington would have had to die while employed by Radio One, his employer when he executed the MSA, and Radio One would have had to retain in force the insurance coverage from the date of the Divorce Decree to the date of Mr. Washington's death. But the Divorce Decree left Mr. Washington free to stop working for Radio One or to stop working altogether. And, of course, the Divorce Decree could not prevent Radio One from discontinuing the life insurance arrangement. So, as of the date of the Judgment, Ms. Washington did not have, and could not seek execution based on, a judgment for a certain sum of money.[17]

Second, the Estate argues that if Mr. Washington lost his job, or if Radio One decided to terminate the life insurance coverage, the MSA would require Mr. Washington to obtain alternative coverage or otherwise act to replace the lost benefit to Ms. Washington. We question the Estate's reading of the MSA. But, even if the Estate were correct in its reading, the argument goes to show that any rights Ms. Washington obtained under section 5.1 of the MSA represented at best a commitment by Mr. Washington to undertake one or more specific actions other than the payment of money.[18] An obligation to take such actions is not a judgment for a sum of money.

---

[17] To the extent the Estate maintains that Ms. Washington's claim against the Estate arose on Mr. Washington's death, when it became clear that Ms. Washington would not receive the property specified by the Divorce Decree, that claim for money damages has not been reduced to judgment and therefore could not yet give rise to judgment lien creditor status.

[18] Ms. Washington further maintains that Mr. Washington breached the MSA by failing to notify his employer that Ms. Washington was the new beneficiary under the policy. We are not so sure. The MSA required Mr. Washington to designate Ms. Washington as the beneficiary of his life insurance coverage and then stated: "The

**[\*23]** Finally, the regulations specifically provide that "[i]n the case of a judgment for the recovery of a certain sum of money, a judgment lien creditor is a person who has perfected a lien under the judgment on the property involved." Treas. Reg. § 301.6323(h)-1(g). In determining whether a lien is perfected, "we look first to the local law setting forth the lien procedure and its legal consequences." *Don King Prods., Inc.*, 945 F.2d at 533 (quoting *Hartford Provision Co. v. United States*, 579 F.2d 7, 9 (2d Cir. 1978)); *see also Johnson v. Commissioner*, T.C. Memo. 1999-284, 1999 WL 667281, at \*3 n.6 (noting that the regulations require a judgment lien creditor to comply with local law for creating and perfecting a judgment). Under the law of the District of Columbia, for a money judgment to create a lien, the judgment or decree generally must be "filed and recorded in the office of the Recorder of Deeds of the District of Columbia." *See* D.C. Code §§ 15-101(a), 15-102(a) (2021). The Estate offered no evidence either before IRS Appeals or in this Court that it recorded the Judgment as contemplated by D.C. law. Nor does the Estate argue that Ms. Washington perfected a lien by any other means, such as by following the procedures described in D.C. Code § 15-301–323. The Estate argues that no recording is required under the facts in this case. Opposition at 19. The Estate offers no authority for this proposition, and the only potentially relevant rule we have found—D.C. Code § 46-204(b)[19]—does not help the Estate, as the MSA makes no provision for the payment of alimony or maintenance.[20]

In short, based on the foregoing, even assuming the MSA should be viewed as incorporated into the Judgment, Appeals Officer Duff did

Husband agrees that his notarized signature on page [13] of this Agreement constitutes his irrevocable designation." Thus, Mr. Washington arguably fulfilled his obligation under the MSA simply by signing the MSA. From that point, any party, including Ms. Washington, could have presented the MSA to Radio One and requested the change. It is not clear to us why the Estate should be held responsible for the failure to change the beneficiary of the life insurance policy, nor why the United States should bear the financial burden of Ms. Washington's failure to undertake a ministerial act on her own.

[19] D.C. Code § 46-204(b) provides: "An award of alimony, child support, or maintenance is a money judgment that becomes absolute, vested, and upon which execution may be taken, when it becomes due."

[20] We also note that D.C. Code § 15-101(a) provides that a judgment or decree for the payment of money rendered in the Superior Court of the District of Columbia ceases to have any operation or effect 12 years "from the date when an execution might first be issued thereon, or from the date of the last order of revival thereof." The Divorce Decree at issue here was issued in 2006, and the record does not contain any order of revival. *See* D.C. Code § 15-103 (2021); *see also Massey v. Massey*, 210 A.3d 148, 151, 153–54 (D.C. 2019).

**[\*24]** not err in refusing to treat Ms. Washington as a judgment lien creditor in his reasonable collection potential computation.

### 2. *Inclusion of Proceeds from Section 401(k) Account in Reasonable Collection Potential*

The Estate also argues that a portion of the proceeds of Mr. Washington's section 401(k) account should not be included in its reasonable collection potential because Ms. Washington, as personal representative, has the right to designate herself rather than the Estate as the account's beneficiary.[21] Accordingly, the Estate contends that it has no interest in that portion of the section 401(k) account proceeds unless Ms. Washington acts to designate the Estate as beneficiary, and therefore that the United States' tax lien cannot attach to the proceeds.

In support, the Estate again argues that the terms of the MSA were incorporated in the Divorce Decree, "grant[ing Ms. Washington] the right to designate a beneficiary of those plan proceeds when, as in this case, no beneficiary has been designated." Opposition at 23. And we once again disagree with the Estate's interpretation of the MSA.

The relevant section of the MSA is titled "Waiver of Pension and Retirement Rights" and provides as follows:

> Except as otherwise set forth herein, each party hereby expressly waives any legal right he or she may have under any federal or state law as a spouse or former spouse, or person with an insurable interest, or otherwise, to participate as a "spouse" or "former spouse" or payee or alternate payee or beneficiary or otherwise under the other party's . . . 401(k) . . . plan, . . . including, but not limited to, the right to receive any benefit whether in the form of a lump sum death benefit . . . .

The upshot is that, in signing the MSA, Ms. Washington disclaimed any right to Mr. Washington's section 401(k) account, even if

---

[21] Solely for the sake of analysis, we assume for purposes of this discussion that the Estate properly raised this argument with Appeals Officer Duff at the CDP hearing, although the Commissioner disagrees.

[*25] she otherwise would have had rights to that account under federal or state law.  To enforce this arrangement, the MSA goes on to provide:

> In an effort to comply with the intent of this article; (i) if a party is unable for any reason to change the beneficiary or the death benefits of his or her . . . plan . . . , or, (ii) if a party files an election subsequent to the date of execution of this Agreement but such election is for any reason ineffective and the benefits are, in fact, paid to the surviving party contrary to the intention of this paragraph, or, (iii) if a party fails to designate a beneficiary and the plan provides for payment to the "spouse" or "former spouse," then in any of such events the surviving party shall . . . at the direction of and at the sole discretion of the decedent's personal representative, either: (A) disclaim any entitlement to any benefits received or receivable; or (B) assign all rights to receive such benefits to the estate of the deceased party or the person designated by the decedent or the decedent's personal representative to receive such benefits; or (C) pay the next after-tax benefits over to the estate of the deceased party or to the person designated by the decedent or the decedent's personal representative.

The text of the MSA shows that the personal representative's authority to direct the assignment or payment of benefits is triggered by certain conditions.  Namely, Mr. Washington must have failed to change his beneficiary successfully or to provide for a beneficiary, with the result that Ms. Washington is paid benefits under the terms of the plan (contrary to the intent of the MSA).  None of these conditions was triggered here.  Mr. Washington's section 401(k) plan did not make any payments to Ms. Washington as a former spouse.  Accordingly, the enforcement provisions of section 4.6(c) of the MSA remained dormant, and the personal representative simply had no occasion to exercise any rights under those provisions.

Moreover, as the Commissioner points out, the actions of the plan and Ms. Washington herself belie any assertion that the MSA gave the personal representative a plenary right to change the beneficiary of Mr. Washington's section 401(k) account after his death.  The balance of Mr. Washington's section 401(k) account was always included as an asset of the Estate in reports Ms. Washington filed with the State of

**[\*26]** Maryland's "orphan's court."[22] And that balance was eventually deposited in the Estate's bank account.

The Estate's claim that the personal representative was entitled to change the beneficiary of the section 401(k) account after Mr. Washington's death and before any distributions were made (thus, defeating the United States' lien on those proceeds) also flies in the face of the relevant regulations. Treasury Regulation § 1.401-1(b)(4) provides that a plan like the one in which Mr. Washington participated "is for the exclusive benefit of employees or their beneficiaries." The regulations go on to explain that "[t]he term 'beneficiaries' of an employee within the meaning of section 401 includes the estate of the employee, dependents of the employee, persons who are the natural objects of the employee's bounty, and any persons *designated by the employee* to share in the benefits of the plan after the death of the employee." Treas. Reg. § 1.401-1(b)(4) (emphasis added). A personal representative is not the employee, and if a plan were to allow the personal representative to direct proceeds of the plan at will following the employee's death, that plan would not comply with section 401. *See id.*

Based on the foregoing, we conclude that Appeals Officer Duff did not abuse his discretion in determining that the section 401(k) proceeds were properly includible in the Estate's reasonable collection potential.

### 3. *Other Alleged Reasonable Collection Potential Calculation Errors*

The Estate further contends that certain other expenses were erroneously excluded from the Estate's reasonable collection potential and that Appeals Officer Duff "double-counted" items in calculating reasonable collection potential.[23] But we have consistently held that errors in reasonable collection potential calculations are harmless, even when considering offers-in-compromise made on a "doubt as to collectibility with special circumstances" basis, when the correct, or allegedly correct, reasonable collection potential is still greater than a

---

[22] The orphan's courts are Maryland's probate courts. *Radcliff v. Vance*, 757 A.2d 812, 816 (Md. 2000).

[23] For example, the Estate alleges that Appeals Officer Duff erroneously included in the reasonable collection potential computation veterans' benefits that were ultimately returned and a $20,000 tuition payment for the benefit of the Washingtons' son, of which $10,000 was returned.

**[\*27]** taxpayer's offer. *See, e.g.*, *Gustashaw*, T.C. Memo. 2018-215, at \*23–24 & n.33 (citing *Estate of Duncan v. Commissioner*, T.C. Memo. 2016-204, at \*22 n.5, *aff'd*, 890 F.3d 192 (5th Cir. 2018)) (finding that in evaluating the taxpayers' revised offer-in-compromise submitted on a "doubt as to collectibility with special circumstances" basis, the settlement officer made errors in calculating the taxpayers' reasonable collection potential; however, the errors were harmless because the taxpayers' reasonable collection potential, even when adjusted for the settlement officer's errors, far exceeded the offer-in-compromise amount); *see also Tucker v. Commissioner*, 676 F.3d at 1136–37 (holding that this Court is not barred from upholding a settlement officer's rejection of an offer-in-compromise even when the settlement officer made errors in calculating the taxpayer's reasonable collection potential).[24]

Aside from the Estate's arguments relating to the life insurance and section 401(k) account proceeds, which we have addressed above, none of the remaining errors alleged by the Estate is significant enough—either alone or combined with others—to reduce the Estate's reasonable collection potential below the amount of its revised offer-in-compromise. Therefore, even if the Estate's assertions were correct, the mistakes would constitute harmless error and would not amount to an abuse of discretion. *See Estate of Duncan*, T.C. Memo. 2016-204, at \*22 n.5 ("Determination of [the taxpayer's] exact [reasonable collection potential] would be a meaningless exercise where (as here) the taxpayers admitted that their reasonable collection potential exceeded their offer . . . ."); *see also Tucker v. Commissioner*, 676 F.3d at 1137 ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004))).

---

[24] *Alphson v. Commissioner*, T.C. Memo. 2016-84, at \*16 ("Even if the settlement officer makes some errors in calculating the reasonable collection potential, we uphold determinations when the taxpayer's offer-in-compromise was far less than the correct reasonable collection potential."); *Johnson v. Commissioner*, T.C. Memo. 2007-29, 2007 WL 415319 (finding that when error in reasonable collection potential calculations is corrected, and reasonable collection potential still exceeds offer-in-compromise amount, the erroneous calculation did not amount to an abuse of discretion), *aff'd in part sub nom. Keller v. Commissioner*, 568 F.3d 710 (9th Cir. 2009); *Lindley v. Commissioner*, T.C. Memo. 2006-229, 2006 WL 3040938, at \*6 (finding that settlement officer's errors in calculating reasonable collection potential "were harmless because, even when corrected, [the taxpayers'] reasonable collection potential exceeds their offer amount"), *aff'd in part sub nom. Keller v. Commissioner*, 568 F.3d 710.

**[\*28]** C.    *Consideration of Special Circumstances*

Finally, the Estate argues that Appeals Officer Duff abused his discretion by not fully or properly considering the factors listed in IRM 5.8.11.3.2 to assist IRS employees in determining whether special circumstances warrant acceptance of an offer-in-compromise in an amount less than a taxpayer's reasonable collection potential. It is not necessary for an IRS Appeals officer to "specifically list in the notice of determination every single fact that [he] considered in arriving at the determination" that no special circumstances exist. *Johnson v. Commissioner*, 2007 WL 415139, at \*5. Additionally, IRM provisions are not binding, nor do they confer specific rights on taxpayers.[25] In any event, the record shows that Appeals Officer Duff did consider the Estate's Supplemental Statement of Special Circumstances and the facsimile sent to Appeals Officer Duff on April 29, 2021, and determined that special circumstances warranting the acceptance of the Estate's revised offer on a "doubt as to collectibility with special circumstances" basis were not present.

The Estate's main contention in the Supplemental Statement of Special Circumstances was that the Estate was insolvent, in large part because of Ms. Washington's alleged judgment lien on the Estate. As we have previously discussed in Part III.B.1 above, we see no error in Appeals Officer Duff's determination that any claims Ms. Washington might have with respect to Mr. Washington's life insurance proceeds should not affect the Estate's reasonable collection potential calculations.

The Estate raised other arguments[26] in its Opposition alleging special circumstances. But the record indicates that the Estate failed to raise these arguments either during the initial hearing or during the supplemental hearing. In the circumstances here, we cannot hold that Appeals Officer Duff abused his discretion by not considering arguments

---

[25] *See supra* cases cited note 8; *see also Fargo v. Commissioner*, 447 F.3d at 713 (explaining that the IRM does not have force of law, certain provisions are merely advisory in nature, and the IRM gives IRS Appeals officers considerable discretion to accept or reject offers-in-compromise); *Riland v. Commissioner*, 79 T.C. 185 (1982) (finding that the failure to abide by procedures contained in the IRM is not a violation of due process).

[26] The special circumstances alleged included Ms. Washington's service to the Estate as personal representative, her advancing of funds to the Estate (which were ultimately reimbursed from the Estate's account), and her time and effort expended in resolving the Estate's state and federal tax liabilities.

**[\*29]** that were not presented to him. *See Giamelli*, 129 T.C. at 115; *see also Boulware v. Commissioner*, 816 F.3d 133, 136 (D.C. Cir. 2016), *aff'g* T.C. Memo. 2014-80.

Even assuming that these arguments were properly before IRS Appeals, we would not find their rejection to be an abuse of discretion on the facts of this case. When boiled down to their essence, the Estate's arguments amount to a plea (1) that Mr. and Ms. Washington's son be permitted to retain $100,000 in life insurance proceeds paid to him under the policy maintained by Mr. Washington's employer, (2) that Ms. Washington (who, under the MSA, was supposed to have received the life insurance proceeds) be permitted to recover instead $100,000 from a retirement account to which she had disclaimed all rights, and (3) that the United States be required to compromise its claim for tax due on the substantial income that Mr. Washington earned during the Relevant Tax Years. We do not see how effective tax administration could possibly support such a result. *See* Treas. Reg. § 301.7122-1(b)(3)(iii).

## IV.    *Conclusion*

For the reasons set out above, the Commissioner is entitled to judgment as a matter of law.

To reflect the foregoing,

*An appropriate order and decision will be entered.*